BUNKER HILL & SULLIVAN MINING & CONCENTRATING CO. v. EMPIRE STATE–IDAHO MINING & DEVELOPING CO. et al.

(Circuit Court of Appeals, Ninth Circuit. May 6, 1901.)

No. 630.

1. MINING CLAIMS—UNDERGROUND RIGHTS—OVERLAPPING CLAIMS.

The locator of a lode mining claim having the right to lay any of his lines within or across the surface of a valid prior location, in the absence of objection by its owner, for the purpose of securing to himself underground or extralateral rights not in conflict with any rights of the senior location, where a junior claim overlaps, having one of its parallel end lines laid within or across a senior location, its owner acquires all the rights, both surface and extralateral, as against the government and subsequent locators, that he could have if the prior location had not been made; and he may follow the vein in its downward course between the planes of his own end lines in all respects as though there were no prior location, except where it would conflict with the rights of the owner of such senior claim.

2. SAME—CONCLUSIVENESS OF PATENT—PRIORITY OF LOCATION.

An application for a patent for a mining claim carries with it an implied, if not an express, allegation that the location was made upon land at the time open to location, and was therefore prior to the location of any one else; and the issuance by the government of a patent therefor conclusively determines the priority of that location over any other, and confers upon the patentee not only the title to the entire surface of the claim, but also all extralateral rights given by statute, as against the owner of an unpatented conflicting claim.

In Error to the Circuit Court of the United States for the District of Idaho.

For former opinion, see 108 Fed. 189.

Curtis H. Lindley and John R. McBride, for plaintiff in error.

W. B. Heyburn, E. M. Heyburn, and L. A. Doherty, for defendants in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. This is an action of ejectment, in which the plaintiff in error was plaintiff in the court below. It involves an underground segment of a mineral-bearing ledge claimed by the plaintiff in the action to be a portion of the Stemwinder mining claim, which claim confessedly is, and was at the time of the alleged trespass upon it by the defendants, owned by the plaintiff. The case comes here on the judgment roll. Annexed to the findings of the court, and made a part of them, is a diagram showing the Stemwinder, Emma, and Last Chance mining claims, with the

vein passing through each of them in a northwesterly and south-easterly direction, which diagram is here inserted, to illustrate the positions and claims of the respective parties:

The defendant Last Chance Mining Company is shown by the findings to be the owner of the Emma and Last Chance claims. Both of the latter were patented by the United States more than five years prior to the commencement of this action. The Stem-winder has not been patented. Each of the claims was located in the year 1885. When the claimant of the Emma applied to the government for a patent therefor, the claimant of the Stemwinder filed in the land office an adverse claim to that portion of the ground in conflict between the two claims, and thereafter brought an action in the district court of the First judicial district of the then territory of Idaho to establish the alleged priority in location of the Stemwinder over the Emma, but which action resulted in a judgment establishing the priority of the Emma. In respect to the Stemwinder and Last Chance claims the court below found—

"That the Last Chance lode mining claim, as shown on said diagram A above [the diagram already set out], was located by its original claimants subsequent to the location of the Stemwinder, and although the worded notices of each dated on the same day of September, 1885, the Stemwinder discovery and location was made prior to the said Last Chance, and its rights attached first to the ground now in dispute between the parties; and I find that upon an application for patent to the Last Chance lode mining claim, as described in said diagram, no adverse claim was made by the said Stemwinder owners to the ground in conflict as shown on said diagram, and that the said Last Chance Mining Company received their patent therefor as so described, and is entitled to all the rights conferred by such patent."

The eighth, ninth, tenth, eleventh, and twelfth findings of fact are as follows:

"Eighth. That there is a large ledge or lode of mineral-bearing rock and earth in place which enters the southerly end line of the Stemwinder lode claim, approximately having the course and width shown on the diagram A, and passing on its course through the said Stemwinder, the said Emma, and the said Last Chance lode claims, and having a dip southwesterly of from 35 to 40 degrees from the perpendicular; and, on its descent into the earth, developments show that it passes far beyond the surface of each of the said claims, and said vein or lode has its apex in each of said claims

to the extent indicated on said diagram. Ninth. That the lines which cross said lode on its course through the Emma claim are not parallel, and so converge in their prolongation to the westerly that planes drawn downward along the course of said lines intersect each other at a point marked 'X' on said diagram, and the rights of the owners of the said Emma lode claim to the lode cease at that point. Tenth. That the lines, a, b, c, d, on said diagram, correctly show the lines on the surface, projected from the southeasterly and northeasterly corners of the Stemwinder lode claim, and indicate its right to follow the lode on its descent westerly, except as modified by the rights which defendants are adjudged to have by virtue of these findings. Eleventh. That the defendants have entered upon and withhold from the plaintiff all that portion of said lode which lies between a plane drawn downwards along the line marked 'a, b,' and the plane of the south end line of said Last Chance claim drawn perpendicularly downwards along and projected to the point Z on said diagram, and assert right and title to same. Twelfth. That the allegation in the answer of the defendant Last Chance Mining Company (subdivision 8), as set forth in answer to the first cause of action in plaintiff's complaint, and also in its answer to the second cause of action therein, that the plaintiff's action is barred by virtue of section 4036 of the statute of limitations, is not sustained by the evidence."

The conclusions of law reached by the court below are as follows:

"The plaintiff's action is not barred by law. That the plaintiff is entitled to recover from the defendant that portion of the lode or vein sued for which lies in the triangular space bounded by perpendicular planes passing through lines described as follows: Commencing at a point where the south line of the Emma, prolonged westerly, intersects the south line of the Last Chance, and indicated on said plat A by the letter 'X'; thence westerly along the prolongation of said Emma line ―――― feet, to the point where the same is intersected by the original south line of the Stemwinder prolonged westerly, and indicated upon said plat A by the letter 'Y'; thence easterly along said prolonged line of the Stemwinder ―――― feet to the intersection of said south line of the Last Chance prolonged westerly, and indicated upon said plat by the letter 'Z'; and thence to the place of beginning ―――― feet along said south line of the Last Chance and its prolongation,—the right of said plaintiff to said segment of said lode or vein being hereby denied to all other portions of said vein or lode sued for in this action by plaintiff, and not contained in above description."

Judgment was entered accordingly, from which the present appeal was taken. In its opinion the court announced its conclusion in these words:

"My conclusion is that the Stemwinder owns only so much of the apex of the ledge, measured along its center, as lies between its south line as originally located and the south line of the Emma, and that, in following the ledge on its downward course, it must be between the prolongation of the planes passing through these lines, which would end at their point of convergence indicated upon the plat by the letter 'Y.' There is another view which might be taken of the Stemwinder's right; that is, that its south boundary line should be considered established, and that another line parallel to it should be established at the point where its ledge passes into the Emma, as was done by the supreme court in the Del Monte Case, supra. Del Monte Min. & Mill. Co. v. Last Chance Min. & Mill. Co., 171 U. S. 55, 18 Sup. Ct. 895, 43 L. Ed. 85. This rule would be followed here, but for the priority of the Emma."

The priority of location of the Emma over the Stemwinder claim is not only found as a fact by the court below, but is conceded by the plaintiff in error; and the plaintiff further concedes, not only in its brief, but in its complaint, that the Emma has the right to follow the vein in its dip between vertical planes drawn through its converging end lines to the point of their intersection. The

underground segment of the vein included within the triangle formed by the prolongation of those two vertical converging end lines and the westerly side line of the Emma, as well as the surface and everything under the surface of the Emma, claim, is thereby eliminated from controversy. Notwithstanding the location and rights of the Emma, the Stemwinder claim was so located as to include within its lines a considerable portion of the Emma's surface. The lines of the Stemwinder that cross the vein are parallel, and are therefore, in law, the end lines of that claim, whether so intended by the locator at the time of its location or not. Mining Co. v. Tarbet, 98 U. S. 463, 25 L. Ed. 253; Argentine Min. Co. v. Terrible Min. Co., 122 U. S. 478, 7 Sup. Ct. 1356, 30 L. Ed. 1140; King v. Mining Co., 152 U. S. 222, 14 Sup. Ct. 510, 38 L. Ed. 419. No doubt, the owner of the Emma could have lawfully prevented any intrusion upon his claim, and have maintained the exclusive possession thereof. As said by the supreme court in Del Monte Min. & Mill. Co. v. Last Chance Min. & Mill. Co., 171 U. S. 55, 83, 18 Sup. Ct. 895, 43 L. Ed. 85:

"A party who is in actual possession of a valid location may maintain that possession and exclude every one from trespassing thereon, and no one is at liberty to forcibly disturb his possession or enter upon the premises. At the same time the fact is also to be recognized that these locations are generally made upon lands open, uninclosed, and not subject to any full actual occupation, where the limits of possessory rights are vague and uncertain, and where the validity of apparent locations is unsettled and doubtful. Under those circumstances, it is not strange—on the contrary, it is something to be expected, and, as we have seen, is a common experience —that conflicting locations are made, one overlapping another, and sometimes the overlap repeated by many different locations. And while in the adjustment of those conflicts the rights of the first locator to the surface within his location, as well as to veins beneath his surface, must be secured and confirmed, why," asks the court, "should a subsequent location be held absolutely void for all purposes, and wholly ignored? Recognizing it so far as it establishes the fact that the second locator has made a claim, and in making that claim has located parallel end lines, deprives the first locator of nothing. Certainly, if the rights of the prior locator are not infringed upon, who is prejudiced by awarding to the second locator all the benefits which the statute gives to the making of a claim? To say that the subsequent locator must, when it appears that his lines are to any extent upon territory covered by a prior valid location, go through the form of making a relocation, simply works delay, and may prevent him, as we have seen, from obtaining an amount of surface to which he is entitled, unless he abandons the underground and extralateral rights which are secured only by parallel end lines. In this connection," continued the court, "it may be properly inquired, what is the significance of parallel end lines? Is it to secure to the locator in all cases a tract in the shape of a parallelogram? Is it that the surveys of mineral land shall be like the ordinary public surveys in rectangular form, capable of easy adjustment, and showing upon a plat that even measurement which is so marked a feature of the range, township, and section system? Clearly not. While the contemplation of congress may have been that every location should be in the form of a parallelogram, not exceeding 1,500 by 600 feet in size, yet the purpose, also, was to permit the location in such a way as to secure not exceeding 1,500 feet of the length of a discovered vein; and it was expected that the locator would so place it as, in his judgment, would make the location lengthwise cover the course of vein. There is no command that the side lines should be parallel, and the requisition that the end lines shall be parallel was for the purpose of bounding the underground extralateral rights which the owner of the location may exercise. He may pursue the vein downward outside the side lines of his location, but the limits of his

right are not to extend on the course of the vein beyond the end lines projected downward through the earth. His rights on the surface are bounded by the several lines of his location, and the end lines must be parallel, in order that going downward he shall acquire no further length of the vein than the planes of those lines extended downward inclose. If the end lines are not parallel, then, following their planes downward, his rights will be either converging and diminishing or diverging and increasing the further he descends into the earth. In view of this purpose and effect of the parallel end lines, it matters not to the prior locator where the end lines of the junior location are laid. No matter where they may be, they do not disturb in the slightest his surface or underground rights."

The court accordingly answered in the affirmative this question propounded to it by the circuit court of appeals for the Eighth circuit:

"May any of the lines of a junior lode location be laid within, upon, or across the surface of a valid senior location for the purpose of defining for or securing to such junior location underground or extralateral rights not in conflict with any rights of the senior location?"

In the case of the Hidee Gold-Mining Company, decided by the secretary of the interior January 30, 1901 (advance sheets), it was held that the location of a lode mining claim may even be laid within, upon, or across the surface of patented lode mining claims for the purpose of claiming the free and unappropriated ground within such lines and the veins apexing in such ground, and of defining and securing extralateral underground rights upon all such veins, where such lines are established openly and peaceably, and do not embrace any larger area of surface, claimed and unclaimed, than the law permits.

As, therefore, upon the facts appearing, there was no valid objection to the Stemwinder location, the next question is, what rights did the owner of that location thereby secure? Confessedly, he acquired nothing as against the Emma, either on the surface or underground. But how is it as against the government and every subsequent locator? In the absence of any objection on the part of the owner of the Emma, the locator of the Stemwinder had, as we have seen, the legal right to extend his lines upon and across that claim. The ground to the north and south of the Emma was, according to the findings, open and unappropriated public land, with a mineral-bearing ledge passing in a northwesterly and southeasterly direction through the Emma and into the adjoining unappropriated public land to the north and south of that claim. Across that ledge and on unappropriated public land the locator of the Stemwinder laid his southerly end line, and along the course of the ledge and on unappropriated public land he laid his westerly side line. Across the ledge, partly on unappropriated public land and partly on the prior Emma location, he laid his northerly end line, parallel with his southerly end line, and along the course of the ledge, partly on the Emma and partly on unappropriated public land, he laid his easterly side line, almost, if not quite, parallel with his westerly side line. As, in the absence of any objection on the part of the owner of the Emma, the locator of the Stemwinder had the legal right to cross the prior location, his lines, as against the government and all subsequent locators, would therefore seem to have been perfectly laid.

Under such circumstances, we are unable to see why, as against the government and all subsequent locators, the location should not carry precisely the same rights, surface and extralateral, that it would carry if none of the lines had been laid upon or over a prior location, which, under the statute governing extralateral rights, would give to the locator of the Stemwinder, as against the government and all subsequent locators, the right to follow the dip of the vein in its departure from the westerly side line of the claim indefinitely between vertical planes drawn through the parallel end lines extended indefinitely in their own direction. We think, too, that this is the logical deduction to be drawn from the reasoning upon which the judgment of the supreme court in the case of Del Monte Min. & Mill. Co. v. Last Chance Min. & Mill. Co., supra, was based. In effect, the court below made the south line of the Emma the north end line of the Stemwinder, thereby destroying the parallelism of the end lines of the Stemwinder fixed by its locator, and either destroying all of its extralateral rights entirely, or limiting them to converging lines intersecting at the point Y on the diagram. This is in conflict with what was held by the supreme court in the Del Monte Case in respect to the line, e, i, of the New York claim. That line, which was the northerly side line of the New York, stood in the same relative position to the Last Chance claim there involved as the south boundary of the Emma claim does to the Stemwinder; and the supreme court, in answer to the third question submitted to it by the circuit court of appeals for the Eighth circuit, held that the easterly side line of the New York did not constitute the end line of the Last Chance claim there in question. Locations of lode mining claims are made for the purpose of reaching the underground veins. "The area of surface," said the court in the Del Monte Case, "is not the matter of moment. The thing of value is the hidden mineral below, and each locator ought to be entitled to make his location so as to reach as much of the unappropriated, and perhaps only partially discovered and traced, vein as is possible." 171 U. S. 75, 18 Sup. Ct. 895, 43 L. Ed. 85.

What has been said is based upon the findings of the court below (which, as the case is presented, must govern us) in respect to the location of the Stemwinder, and the priority in fact of that location over that of the Last Chance claim. The conclusion above indicated we think necessarily follows from those facts, unless it be that the extralateral rights secured by the Stemwinder by virtue of its location were lost or impaired by reason of its failure to contest the application of the Last Chance for a patent to its claim, and the issuance of that instrument. That question remains to be considered. The findings are to the effect that an application for a patent to the Last Chance claim, as described in the diagram above inserted, was made, and that a patent was issued therefor. The Last Chance, as so applied for and patented, included, as will be seen from the diagram, a triangular piece of the ground embraced by the Stemwinder location, and included the westerly portion of the Stemwinder's northerly end line. Notwithstanding that fact, the findings declare that the Stemwinder failed to contest the application of the Last

chance for its patent. What is the consequence? By section 2325 of the Revised Statutes it is provided that a patent may be obtained for land located or claimed for valuable deposits. To accomplish this, a locator who has complied with all the statutory requirements on that subject may file in the proper land office an application for a patent, under oath, showing such compliance, together with a plat and field notes of his claim, made by or under the direction of the surveyor general of the United States, showing accurately the boundaries of the claim, which must be distinctly marked by monuments on the ground. He must also post a copy of his plat, together with a notice of such application for a patent, in a conspicuous place on the land embraced in such plat, previous to filing his application for a patent, and he must also file an affidavit of at least two persons that such notice has been duly posted. A copy of the notice must be filed in the land office. Upon the filing of such papers the register of the land office is required to publish a notice that the application has been made for the period of 60 days in some newspaper to be by him designated as published nearest to the claim, and he must also post a similar notice for the same time in his own office. If no adverse claim shall have been filed with the register and receiver of the proper land office at the expiration of the 60 days of publication, it shall be assumed that the applicant is entitled to a patent, and that no adverse claim exists; and thereafter no objections from third parties to the issue of the patent shall be heard, except to show that the applicant has failed to comply with the law. Where an adverse claim is filed within the time, all proceedings upon the application in the land office, except in reference to the publication of proof of notice, are to be stayed until the controversy shall have been settled or decided by a court of competent jurisdiction, or the adverse claim waived. It is then made the duty of the adverse claimant to commence proceedings in a court of competent jurisdiction to determine the question of the right of possession, and prosecute the same to final judgment. After such judgment shall have been rendered, the party entitled to the possession of the claim may, without further notice, file a certified copy of the judgment roll with the register of the land office, together with the certificate of the surveyor general that the requisite amount of labor has been expended or improvements made thereon, and the description required, as in other cases. When this has been done, and the proper fees paid, the whole proceedings and the judgment roll must be certified to the commissioner of the general land office, and a patent shall issue for the claim, or such portion thereof as the applicant shall appear from the decision of the court to rightly possess. If it appears from the decision that several parties are entitled to separate and distinct portions of the claim, each party may pay for his portion of the claim, together with the proper fees, and file with the certificate a description by the surveyor general, whereupon the register shall certify the proceedings and judgment roll to the commissioner as in the preceding case, and patents shall issue to the several parties according to their respective rights. Section 2326, Rev. St.

The claim that the applicant is by the foregoing provisions of the

statute authorized to purchase and receive a patent for, upon full compliance with those provisions, is the claim that he was by preceding provisions of the same statute authorized to locate, namely, one upon unappropriated public land of the United States of the character described in the statute. The application for the patent, therefore, necessarily carried with it, if not an express, certainly an implied, allegation that the location upon which the application was based was made upon land open to location, and therefore was the prior location. The publication of the notice of the application required by the statute was a notice to all the world to present to the land office any and every adverse claim to that of the applicant. A failure to do so constituted, in law, an admission of the truth of every fact covered by the application; and the issuance of a patent in pursuance of such application is, in the absence of any adverse claim, quite as conclusive of the patentee's rights as if a contest in respect to the application had been initiated in the land office, and adjudicated by a competent court in favor of the applicant. In either case, it is absolutely conclusive against all adverse claimants. Gwillim v. Donnellan, 115 U. S. 45, 5 Sup. Ct. 1110, 29 L. Ed. 348; Mining Co. v. Rose, 114 U. S. 576, 5 Sup. Ct. 1055, 29 L. Ed. 273; Hamilton v. Mining Co., 13 Sawy. 113, 33 Fed. 562; Last Chance Min. Co. v. Tyler Min. Co., 157 U. S. 683, 15 Sup. Ct. 733, 39 L. Ed. 859. The last case cited involved a controversy between the owners of the Tyler claim and those of the Last Chance claim, both locations including a certain triangular strip of ground marked "A" on the diagram found on page 685, 157 U. S., page 734, 15 Sup. Ct., and page 860, 39 L. Ed. The owners of the Tyler claim having applied for a patent for the entire claim, as indicated on that diagram, pursuant to the provisions of section 2324 of the Revised Statutes, the owners of the Last Chance, pursuant to the provisions of section 2325, filed an adverse claim to the conflicting triangle, and thereafter commenced suit in the district court of the First judicial district of the then territory of Idaho. In that action the owners of the Tyler claim appeared and filed an answer, which they withdrew before the case came on for trial; and a judgment was thereupon entered in favor of the owners of the Last Chance, the plaintiffs in the action. That withdrawal was based upon the fact that pending the proceedings in the court the owners of the Tyler claim amended their application for purchase in the land department by excluding therefrom the conflicting triangle. The amended application was accepted by the land office, and a final certificate for the tract, with the reduced boundaries, was issued to the owners of the Tyler claim. The ore bodies in dispute in the case were within the legal end lines of the Last Chance claim, and on the dip of the vein as it passes through it, and also on the dip of the vein within the vertical planes of the end lines of the Tyler extended in their own direction. The solution of the controversy, therefore, turned upon the question of priority between the two locations. When the case was before the supreme court the main question considered, and the question upon which the court disposed of the case, was whether or not the judgment of the district court of the territory of Idaho was admissible

upon the question of priority of the two claims; and the court held that it was not only admissible upon that question, but was "binding by way of estoppel as to every fact necessarily determined by it, and that priority of location was one fact so determined." 157 U. S. 695, 15 Sup. Ct. 733, 39 L. Ed. 859. In that case, as has been said, the owners of the Last Chance claim initiated in the land office a contest against the application of the owners of the Tyler location, and thereafter brought its action in the district court of the territory of Idaho to determine the contest, pursuant to the provisions of the Revised Statutes; in its complaint alleging, among other things, that the Last Chance was the prior location. After answering the complaint, and before the trial of the issues, the owners of the Tyler claim withdrew their answer, and failed to appear at the trial. The court proceeded to hear evidence on the part of the plaintiffs, upon which it made certain findings of fact and conclusions of law, and entered judgment adjudging the Last Chance Mining Company to be the owner of the triangle in conflict between the two locations, "by virtue of a valid location of the said Last Chance mining claim made by John Flaherty, J. L. Smith, M. Carlin, and John M. Burke on the 17th day of September, 1885, and that the plaintiff is entitled to the possession of the said ground so in conflict as aforesaid by virtue of such valid location." It was there contended that the defendants to the suit did not in fact contest the suit, but withdrew their answer prior to trial, and that there was only a judgment by default; but the court very properly answered that a judgment by default was just as conclusive an adjudication between the parties of whatever is essential to support the judgment as one rendered after answer and contest. "The essence of estoppel by judgment," said the court, "is that there has been a judicial determination of a fact and the question always is, has there been such determination? and not upon what evidence or by what means was it reached. A failure to answer is taken as an admission of the truth of the facts stated in the complaint, and the court may properly base its determination on such admission." These observations, it is true, were made in respect to a suit brought in pursuance of section 2325 of the Revised Statutes, pursuant to a contest actually initiated in the land office. But we think it quite clear that a determination of a fact by the judgment of a competent court in a suit brought pursuant to the provisions of the statute, followed by the issuance of a patent in favor of the prevailing party, is no more conclusive than is a patent issued in pursuance of section 2324 of the Revised Statutes for a claim against which no contest was filed. The statute, as has been said, makes any and every person claiming an adverse interest a party to the proceeding for a patent, and provides for ample notice. The notice so provided for is the equivalent of a summons in a judicial proceeding, and he who fails to heed it has no right to complain that his rights are concluded by his default, and the issuance of the patent in pursuance of the application. The land department is, as said by the circuit court of appeals for the Eight circuit in U. S. v. Northern Pac. R. Co., 37 C. C. A. 290, 95 Fed. 864, 869, "a quasi judicial tribunal, and a patent is the judgment of that tribunal upon the questions pre-

sented, and a conveyance in execution of the judgment." The application for the patent for the Last Chance was, as has been seen, for the whole claim, ·as indicated on the diagram hereinbefore set out, and carried with it, as has been said, the implied, if not the express, allegation that the location was made upon land at the time open to location, and was therefore prior to any location of any one else. The issuance by the government of its patent after due notice to all the world of the application, and ample notice to every one to contest it, conclusively determined the priority of that location over every other, including the Stemwinder, and conferred upon the patentees and their successors in interest not only the entire surface of the claim, but the extralateral right conferred by section 2322 of the Revised Statutes to follow on their dip outside of the side lines, and within vertical planes drawn through the parallel end lines extended in their own direction, all veins, lodes, and ledges, the tops or apexes of which lie inside the surface lines of the claim.

From these views it results that the plaintiff in error was awarded more by the court below than it was entitled to, and therefore has no just cause to complain. But for its failure to contest the application of the Last Chance Company for the patent to its claim and the issuance of that instrument, we should feel obliged, for the reasons first hereinbefore stated, to award the Stemwinder the right to follow the dip of the vein in question outside of its westerly side line and between vertical planes drawn through its end lines, a, b, c, d, extended in their own direction, as against the government and all subsequent locators, saving only the surface and underground rights conceded to the Emma claim. As it is, we must affirm the judgment. Judgment affirmed.