EMPIRE STATE–IDAHO MINING & DEVELOPING CO. v. BUNKER HILL
& SULLIVAN MINING & CONCENTRATING CO.

(Circuit Court of Appeals, Ninth Circuit. June 6, 1904.)

No. 950.

1. MINING CLAIMS—LOCATION—ESTABLISHING LINE ON OLDER CLAIM.

The locator of a lode mining claim has the legal right to lay an end line of his claim on the surface of a prior claim, in the absence of objection by the owner; and, as against the government and subsequent locators, such location carries precisely the same rights, both surface and extralateral, as it would if all its lines were laid on unappropriated ground.

2. SAME—EXTRALATERAL RIGHTS—AGREED BOUNDARY BETWEEN OVERLAPPING CLAIMS.

An oral agreement between the owners of two overlapping lode mining claims, located on the same day, in accordance with which a monument was built, which it was agreed should be a point on the line between the claims, cannot affect the extralateral rights appertaining to one of the claims which has passed into the hands of other owners, having no knowledge of such agreement, as against third parties owning junior claims, and having no interest in the other claim or privity with the agreement.

3. SAME—EFFECT OF AMENDED LOCATION.

An amended location of a lode mining claim, made because of an error as to the course of the vein when the original location was made, in consequence of which the original side lines became end lines, did not operate as an abandonment of all rights under the original location, where it is expressly stated in the new location notice that such was not the intention; and, where the end lines of the amended location do not entirely coincide with the side lines of the original claim, it was not error for the court, in determining collateral rights as against an intervening locator, to draw vertical planes through the side lines of the original claim, which became end lines by operation of law, owing to the course of the vein, and through the end lines of the amended claim, extending both in the direction of the dip of the vein, and to award to the claim extralateral rights in so much of the vein on its dip as lay within both of such extensions; treating as abandoned only so much of the original claim, with its planes so extended, as lay without the extended end-line planes of the amended claim.

4. SAME—WIDE APEX EXTENDING ACROSS SIDE LINE.

Where the apex of a vein is of such width as to extend beyond the side line of a claim onto a junior claim, the extralateral rights therein belong to the senior claim, within its extended end-line planes.

Appeal from the Circuit Court of the United States for the Northern Division of the District of Idaho.

See 121 Fed. 973.

F. T. Post (W. B. Heyburn, of counsel), for appellant.

Curtis H. Lindley, Henry Eickhoff, John R. McBride, and M. A. Folsom, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. This is an appeal from a decree quieting the appellee's title, as against the appellant, to the Stemwinder lode claim,

¶ 4. See Mines and Minerals, vol. 34, Cent. Dig. § 76.

and defining its extralateral right in and to the ledge apexing within the surface boundaries of the claim. Annexed to and made a part of the decree is the following diagram, indicating the location of the various claims mentioned in the record, and the course of the vein in question:

The bill avers that the appellee owns and is in possession of the Stemwinder claim, the surface ground of which is indicated by the parallelogram marked on the diagram "Stemwinder Amended Location," except such portions thereof as are included within the surface lines of the Emma and Last Chance claims, and excepting, also, such parts of the lode or vein having its apex within the Stemwinder boundaries as lie within the surface lines of the Emma and Last Chance, and as lie underground between planes drawn downward through the end lines of the Emma claim produced southwestwardly to their intersection, and between planes drawn downward through the end lines of the Last Chance claim extended indefinitely in their own direction. The bill alleges that the course of the apex of the vein at the surface is as shown upon the diagram, and that its downward course is westwardly; that the appellee owns and is in possession of all of the veins so apexing within the surface lines of the Stemwinder, throughout its entire depth, on its downward course between the end-line planes, as indicated on the diagram, except such parts thereof as are embraced by the end-line planes of the Emma and Last Chance claims. The bill avers that the appellant claims an estate or interest adverse to the appellee in the Stemwinder claim, and in such part of its vein as lies westerly of and beyond a vertical plane drawn downward through the westerly boundary of the Stemwinder claim, and northwesterly of and beyond a vertical plane drawn downward through the northwesterly boundary of the Last Chance claim, and between vertical planes drawn downward through the end lines of the Stemwinder claim, extended westwardly indefinitely in their own direction; that the claim of right so asserted by the appellant is false and groundless, and a cloud upon the appellant's title; that since September 1, 1899, the appellant, by means of underground workings, of which it has exclusive possession and control, has penetrated into that part of the underground vein so claimed to lie within the Stemwinder's extralateral boundaries, and beyond the end-line plane of the northern boundary of the Last Chance claim; and that the said underground vein, where so penetrated, contains large and valuable ore bodies, which appellant is extracting, and threatens to extract, unless enjoined from so doing.

The demurrer and the plea filed by the appellant to the bill in the court below were before this court, and were here considered and determined, on the appellant's appeal from the order of the trial court awarding the appellee an injunction. The decision here was that the bill was good and sufficient, and that the plea, in both of its branches, was bad. Empire State-Idaho M. & D. Co. v. Bunker Hill & Sullivan M. & C. Co., 58 C. C. A. 311, 121 Fed. 973. That decision has become the law of the case, and those points, again elaborately discussed by counsel for appellant, are not open to further consideration.

The appellant, in its answer to the bill, denies that the appellee is now, or ever was, in the possession of, or entitled to the possession of, the Stemwinder lode claim, as described in the bill, or was ever in the possession of any part of the Stemwinder lode claim, except as particulary set forth in the answer; denies that the diagram annexed to the bill as an exhibit correctly shows the surface boundaries of the

Stemwinder claim, or the course of the apex of the vein, or of any veins, at the surface through that claim, or that such vein or any vein passes through the surface of the Stemwinder claim as shown upon that diagram. The appellant admits in its answer that there is within what it terms the pretended Stemwinder claim, and within the Emma and Last Chance lode claims, a vein of mineral-bearing rock, but denies that the general course or top or apex of the same at the surface is as stated in the bill, or as shown upon the diagram annexed thereto; denies that the Stemwinder claim has any northerly boundary line, except as the southerly line of the Emma lode claim may be so considered; denies that the lode or vein has a downward course as indicated upon the diagram annexed to the bill, and denies that it passes on its downward course between the end lines claimed by the appellee as the end lines of the Stemwinder claim, or extends indefinitely beyond a vertical plane drawn through the line claimed by the appellee as the westerly boundary thereof; denies that the appellee is or ever was the owner in fee of the Stemwinder claim, or is or ever was the owner in fee or at all of the vein beyond the westerly line of the Stemwinder claim; denies that the appellant claims any estate, right, title, or interest in the Stemwinder claim, and denies that the appellee has any interest, right, or title to any vein which may intersect or lie within the Stemwinder claim after such vein has departed from the exterior boundary lines thereof, or to any vein lying westerly of and beyond the westerly boundary line of the Stemwinder claim, or beyond the northwesterly boundary line of the Last Chance claim, between vertical planes drawn through the end lines of the Stemwinder, as claimed by the appellee; denies that the Stemwinder claim is of any value, but admits that the portion of the vein in controversy is of the value of $50,000. The appellant then alleges that it is the owner of the ledge and ore bodies here in controversy, because of its ownership of the San Carlos lode claim; that the vein in which the said ore bodies lie passes on its strike or course through both end lines of the San Carlos claim, and outcrops throughout the entire length thereof, and descends into the earth on planes drawn through the end lines thereof in a southerly direction to and through the ore bodies claimed by the appellee in this suit, and that such ore bodies are the property of the appellant by reason of the fact that they are a part of the lode having its top or apex within the San Carlos claim, and are reached through continuous workings on that claim, following on the downward course of the ledge within planes drawn on the end lines thereof, and not otherwise; that the Stemwinder claim is unpatented, and that its boundaries are not marked upon the ground at all; that it lies far to the east of the ledge and ore bodies sought to be recovered in this suit, and has no connection therewith; that there is no means of approach to said ore bodies or to said portions of the ledge from the Stemwinder claim, and that no developments from the Stemwinder claim to the ore bodies in controversy have been made, and that there are intervening between the said ore bodies and the Stemwinder claim the Emma and Last Chance patented mining claims, belonging to the Last Chance Mining Company, not a party to this suit; that, in a suit heretofore pending and determined in this court, the Last

Chance Mining Company was adjudged to be the owner of the Last Chance and Emma lode claims, and of the ledge and ores therein, as against the appellee, by reason of priority and right of title thereto; that the appellee has no right of way or ingress or egress through the said Emma and Last Chance claims, and has no right to follow from the Stemwinder claim to the ore bodies in controversy through or over the Emma and Last Chance claims. The appellant then alleges that the Stemwinder claim, such as it is, is junior in point of time and right to the Viola, San Carlos, and Skookum lode claims, owned by the appellant; that the Stemwinder claim never did extend north of the south line of the Emma claim, as patented, and that the locators and claimants of the Stemwinder claim, under whom the appellee claims title, did, by agreement, in conjunction with the owners of the Emma and Last Chance claims, erect a monument on the south line of the Emma claim for the purpose of marking the extreme northern limit of the Stemwinder claim, and of any right which that claim had on the surface or underground; that no stakes or monuments marking the pretended north end line of the Stemwinder claim, or marking any corner or line of that claim, were ever placed on or within the Last Chance or Emma claims with the consent of the owners thereof, but that every attempt to place any stakes of the Stemwinder upon the Emma or Last Chance claims was forbidden and prevented by such owners, and the parties so placing said stakes were compelled to withdraw them, and that, in order to definitely establish the limit of the Stemwinder location to the northward, the said monument was erected jointly by the owners of the Emma and Last Chance and Stemwinder claims; that, in patenting the Emma lode claim, the said monument was recognized as the boundary, and the official line established thereon; that, notwithstanding the said monument and the patenting of the said Emma claim, the successors in interest of the Stemwinder claim undertook to ignore the said boundary and the monument, and, upon the making of the application for patent by the owner of the Emma location, the then owner of the Stemwinder claim filed an adverse claim in the United States land office, and commenced a suit in support thereof against said application for patent, which suit involved the question of whether the Stemwinder claim ever extended over a part of the Emma and Last Chance claims, or north of the said monument and south line of the Emma claim, as surveyed for patent; that the said suit was tried, and judgment rendered therein against the Stemwinder claim, and that it was decreed that the ground in controversy between the Emma and the Stemwinder claims was a part of the Emma claim, as located and claimed by the locators thereof on the 17th day of September, 1885; that this judgment remains unreversed, and was affirmed in the Supreme Court of Idaho (21 Pac. 1040) and by the Supreme Court of the United States (13 Sup. Ct. 1052, 37 L. Ed. 960); that the owners of the Last Chance lode claim made application for United States patent, and gave notice thereof in the usual manner, and that the claimants of the Stemwinder claim filed no adverse claim against such application for patent; that at the time of the attempted location of the Stemwinder claim, on the 17th day of September, 1885, the lode and

surface ground attempted to be located was not a part of the vacant, unappropriated public land of the United States, and that the location thereof was void as to every part thereof north of the original south line of the Emma location; that the claim attempted to be located as the Stemwinder was not the same location or lode claim that appellee now claims and seeks to recover upon in this suit, as to shape, direction, or identity; that the appellee has been guilty of laches in asserting its pretended claim, inasmuch as the appellant has openly claimed the premises sued for since 1898, and has openly mined upon and extracted ore therefrom, and been in the open and notorious possession thereof, since 1899, of which the appellee has had full knowledge. The appellant then alleges that the plane upon which the appellee is seeking to follow between its pretended end lines is laid along the strike of the ledge, and not upon its downward course or dip, and that the ore bodies claimed by the appellee in this suit are not upon the downward course of any ledge having its top or apex within the Stemwinder claim.

To this answer the appellee filed its replication, and upon the issues thus raised the cause was tried in the court below.

Allusion has already been made to the previous decision of this court in respect to the sufficiency of the bill, and of the pleas thereto interposed by the appellant. Another point again argued by the learned counsel for the appellant was also determined adversely to his contention in our former decision in this cause, namely, that the intervention of the extralateral rights of the Emma and Last Chance claims did not cut off or extinguish the right of the owner of the Stemwinder to follow its vein or lode beyond the end-line planes of the Emma and Last Chance, 58 C. C. A. 311, 121 Fed. 973. And still another point urged by appellant's counsel, to wit, that the awarding the appellee the extralateral right in question is to permit it to follow the vein more upon its strike than upon its dip, was decided against his contention at the present term, in the case of Last Chance Mining Co. et al. v. Bunker Hill & Sullivan Mining & Concentrating Co., 131 Fed. 579. Several other points, however, remain to be considered and determined.

The case shows that the Stemwinder claim was originally located in September, 1885; its location notice bearing date September 17th of that year. At the time of such location it was thought by its locator that the vein outcropping within the claim ran easterly and westerly. Accordingly its length was laid in that direction, as is indicated on the diagram. The same mistake was made by the locators of the Emma and Last Chance claims, and of other claims in the same vicinity, as appears in this and other records in this court. The Stemwinder has not been patented, and it is contended by the appellant that it does not appear from the record that that claim ever was marked or staked on the ground as claimed by the appellee. One Devine was its original locator. His testimony in respect to the marking of the boundaries of the claim is as follows:

"Q. What did you do, if anything, with reference to marking the boundaries of that claim? A. I put up three stakes on the east end; that is, I blazed them. I had a small ax, and I blazed them that day, and put up one stake—made a monument and put up one stake on the northeast corner—and the other two were blazed on the east end. On the west end I blazed two trees, and

did not put up my southwest corner stake that day. I put them all up but one that day. Q. When did you put up the last stake? A. Shortly afterwards. Q. Within how many days afterwards? A. I think the next day, or the next day but one. Q. Now, let us go to those corners, and see if you can recollect what the character of them was, and how they were marked. What was the northwest corner? A. It was a pine tree, about 12 inches through, I guess. We afterwards squared it up and cut the tree off. Q. Made a stump of it? A. Made a stump of it; yes, sir. A stake of it, proper. Q. How was that tree marked? A. It was marked, 'Northwest corner of Stemwinder claim.' Q. Did you set a stake at the west center end? A. No, sir. I marked on a stub—a big stub, probably 50 feet high; blazed it on each side. I didn't cut that off. Q. A standing tree? A. No, sir; it was a stub at the time, probably 40 to 60 feet high. Q. A dead tree? A. Yes, sir. Q. Standing in its natural position? A. Yes, sir. Q. Did you square that? A. I squared it on four sides, but I did not cut it down. Q. How did you mark it? A. I marked it, 'West center end of the Stemwinder.' Q. With regard to the southwest corner, what was the character of the marking at that point? A. Well, that day I did not put up any mark there. Q. You put it up on the next day? A. On the next day or two I put up a stake. Q. What was the size of the stake, and how high did it stand up above the ground? A. Oh, the stake was probably five inches through after it was squared up, and stood four or five feet above the top of the ground —I suppose, four and a half feet. I don't know exactly. I know I got it long enough. Q. Was it firmly planted in the ground? A. Yes, sir. Q. How was it marked? A. It was marked, 'Southwest corner of Stemwinder.' Q. What marking, if any, did you place at the southeast corner of the claim? A. At the southeast corner? Q. Yes. A. I blazed the tree and cut that off, on the southeast corner, and made a stake of it. It was a stub at the time I cut it off. Q. You squared the tree, did you? A. Yes, sir. Q. What was the size of it after it was squared? A. Oh, I suppose it was five or six inches through. Q. Five or six inches square? A. I think so; yes, sir. Q. How was it marked? A. Marked, 'Southeast corner Stemwinder claim.' I posted the notice on it— the same as all the stakes I put on the ground. Q. What marks did you make at the east center end, if any? A. The east center end was a tree about 12 or 14 inches through. Q. A live tree? A. No, sir, it was dead; and I marked that, 'East center end of the Stemwinder,' and afterwards cut the tree down. Q. Did you substitute anything for the tree afterwards? A. No, sir. There was a stake there, yes; but then there was also the notice on the tree when I cut it down, making a stake of it, too. Q. Was there a post subtituted for that center end? A. Yes, sir. Q. What was the character of the post? A. It was a hewed post, probably five or six inches through, squared up. Q. How high did it stand above the ground? A. Four or five feet. I don't know exactly. Q. What did you place, if anything, by the northeast corner? A. At the northeast corner was a little monument of rocks, and I placed a little stake in that, the day I located the claim, and afterwards put a good stake there, probably four or five inches through. That was the northeast corner. Q. How did you mark that? A. 'Northeast corner of the Stemwinder.' Q. Did you mark the east center end stake? A. Yes, sir. Q. How did you mark that? A. Marked it, 'East center end of the Stemwinder.' Q. Wherever there were stakes placed in the ground, were they all firmly placed? A. Yes, sir. Q. I will ask you, with reference to this marking, whether or no the lines could be readily traced from this marking? A. Yes, sir; they could. Q. Where did the Stemwinder claim lie with reference to the Bunker Hill? A. It laid very nearly north of the Bunker Hill—a northerly direction. Q. How close to it? A. It laid right next to the Bunker Hill. Q. And northerly from it? A. Yes, sir; northerly."

We also extract from the examination of the surveyor who marked the boundaries of the amended location of the Stemwinder the following:

"Q. Mr. Loring, you testified yesterday that you had made an amended location of the Stemwinder for the Stemwinder Mining Company, and, I believe, testified and identified the notice which was posted, copy of which was re-

corded. What did you do with reference to marking that claim on the surface? A. I established a post at either corner, and at the north and south end centers. Q. Describe the character of the posts, and the markings that were placed upon them. Mr. Heyburn: Wasn't that all gone into? Mr. Lindley: No, sir; it was overlooked. Mr. Heyburn: If counsel will state that, perhaps, we may shorten— What is it you want? Mr. Lindley: The stakes of the amended location of the Stemwinder. I wish to prove that they were properly marked, and, with regard to the northwest corner stake, the manner in which he ultimately tied that stake to a certain point. The stake itself in later years, of course, has been—is gone. It has been replaced by data furnished by Mr. Loring. Mr. Heyburn: Is it not a fact that, as a matter of law, you would be bound by the point fixed upon, if there has been an official survey, and that the Surveyor General would require that post put on that point if there is any dispute about it? Mr. Lindley: All I wish to show by this witness is that the Stemwinder stakes were all of the proper size required by law, of the amended location, and that they were properly marked according to law, and that the northeast corner stake, as now delineated on the maps of James M. Porter, is where Mr. Loring placed it. Mr. Heyburn: There is no controversy about it. We will let it go in. Mr. Lindley: Q. Go ahead. A. The south end center was a post six feet long and six inches square, and marked, 'South end center of the amended location of the Stemwinder.' The southwest corner was a post five feet long, four inches in diameter, squared, and marked, 'Southwest corner Stemwinder lode amended location.' Southeast corner was a post four inches in diameter, five feet long, marked, 'Southeast corner Stemwinder lode, amended location;' and the southeast corner, as I described, was 207.8 feet from the northwest corner of the Bunker Hill lode, as originally staked. The northwest corner was a post four inches in diameter, squared, and five feet long, and marked, 'Northwest corner of Stemwinder lode, amended location;' and the northeast corner was a post five inches in diameter, squared, five feet long, marked, 'Northeast corner Stemwinder lode, amended location.' The north end center I think I have not described yet. A post four inches in diameter, squared, five feet long, marked, 'North end center Stemwinder lode, amended location.' Q. Does that complete the marking? A. It did. Q. In any subsequent period, Mr. Loring, did you have occasion to fix the locality where that stake stood with reference to any other survey? A. You refer to the northwest corner? I did. Q. State how you tied that particular corner stake subsequently. A. In July of that year I made a survey and planted center corners. I then connected the northwest corner of the Stemwinder lode, amended location, with that center corner. Mr. Heyburn: The corner of this claim? A. Of a survey I made. Mr. McBride: July of what year? A. 1887. Mr. Lindley: Q. At that time the corner stake of the Stemwinder was still standing? A. They were all standing for at least two years thereafter."

At the time of the making of the original location of the Stemwinder, no objection appears to have been made by anybody to its lines as laid.

Although, as has already been said, it has been determined in previous litigation between the owners of the Stemwinder, Emma, and Last Chance that the two last-mentioned claims were prior in point of time to the Stemwinder, Devine's testimony in this case is to the effect that, as a matter of fact, at the time he marked the boundaries of the Stemwinder neither the Emma nor Last Chance had been located; and the testimony of J. I. Smith, one of the locators of the Emma and Last Chance, rather corroborates Devine in that particular. At all events, the boundaries of these three claims, all of which were located on the same day, and all upon the mistaken impression of their locators that the vein or lode outcropping within them ran easterly and westerly, overlapped; and the question of the overlapping having arisen between the owners of those claims, who seem to have been friendly at the time, they went upon the ground and measured 300 feet northerly from the

Stemwinder discovery point, and there built a stone monument, which they orally agreed should be a point in the northerly line of the Stemwinder and the southerly line of the Emma. So far as appears, no other point in such line was designated, and no record anywhere made of such oral agreement. Time ran on, and on the 15th of March, 1887, the Stemwinder Mining Company, a corporation, acquired the Stemwinder claim, without, so far as appears, any knowledge of the oral agreement concerning the stone monument, and on the 23d of May, 1887, amended the location of the Stemwinder in the manner indicated on the diagram, from which it will be seen that the amended location is almost entirely within the original, although, in defining the end lines of the amended location, courses very slightly varying from those of the original side-end lines were given. At different times, commencing with February 20, 1886, and ending with May 21, 1887, the Viola, Skookum, San Carlos, Cariboo, and Jersey Fraction claims, belonging to the appellant herein, were located. The relative position of these intervening claims is also shown on the diagram. The purpose of amending the Stemwinder location was thus stated in the notice of such location:

"That said mining claim was duly located on the 17th day of September, 1885, by S. R. Devine, who was a citizen of the United States over the age of 21 years, and notice thereof posted on the claim, and recorded in the records of Shoshone County, Idaho Territory, in Vol. C of quartz locations, page 318, on the 26th day of September, 1885, to which record reference is hereby had, and made a part of this amended location, and as a basis thereof, and thereafter said locators by conveyances duly made and recorded sold the same, and the said company by divers mesne conveyances has become and is now the owner of said mining claim, and is in possession thereof and owns all the right, title and interest of said locators therein formerly owned and held by them. That since said original location was made the true course, position, and the strike of the vein as originally located, marked out and defined as the Stemwinder vein or lode, has been demonstrated and determined, and within the line as originally staked and located herein, and by survey it has also been demonstrated that said locators staked out on each side of said vein, ground in excess of 300 feet on each side of said vein, and the object of this amended location is to conform to the laws relating to mining claims, both national and local, and to mark and define and record the same to the extent and with the boundaries hereinafter set forth, the same being within the boundaries so located, marked, and staked in the original location hereof, and not otherwise. Therefore, the said the Stemwinder Mining Company, by and through its said officers duly authorized hereby, give notice that it hereby locates the vein and lode so discovered originally by way of Amended Location for the purposes aforesaid, and hereby claim the vein within the limits and to the extent as follows, to wit:

"Beginning at center of southeasterly end of claim at a post upon which amended location notice is posted, thence north 69° 40′ west 356.85 feet to southwest corner, whence a prominent peak bears south 8° 22′ east, another prominent peak bears north 84° 35′ east—northwest corner, Bunker Hill lode bears north 69° 40′ west, 207.8 feet, thence north 12° 28′ west, 619.6 feet to northwest corner, thence south 69° 40′ east 713.7 feet to the northeast corner, thence south 12° 28′ east 619.6 feet to the southeast corner, thence north 69° 40′ west 356.85 feet to place of beginning, situate about one half mile southwesterly from town of Wardner, on easterly hillside in Yreka Mining District, County of Shoshone, and Territory of Idaho.

"And that said company intends to hold and work said above-described mining claim as provided by the local laws and customs and the mining laws, both local and national. It is further intended herein not to abandon in any manner

or by implication any rights, privileges, property, possession, or title derived, originated, owned or held under the original location hereof; but that the purpose hereof is to more particularly mark, locate, define and describe the ground, vein and premises held by said company, without waiving any rights under said original location, all of which the said company claims as the l--al successor in interest and title and possession derived from said original locators."

The decree of the court below excepted the rights—surface and extralateral—pertaining to the Emma and Last Chance claims, and gave to the appellee the balance of the surface embraced by the lines of the amended location of the Stemwinder, and such portions of the underground segment of the vein apexing within its surface boundaries as lie northwesterly of and beyond a vertical plane drawn downward through the northwesterly line of the Last Chance claim, and between vertical planes drawn downward through the amended north and the amended south lines of the Stemwinder, extended westwardly indefinitely—

"Save and except such as accrue to said respondent [appellant] under and by virtue of its ownership of the Viola, San Carlos, Skookum, Jersey Fraction, and Cariboo claims, shown upon said Exhibit A [the diagram above set out]; that, as against the rights accruing to said respondent [appellant] by virtue of its ownership of the Viola, San Carlos, Skookum, Jersey Fraction, and Cariboo claims, this complainant is the owner of all such underground parts of said vein as lie between a vertical plane drawn downward through the southerly boundary line of said Stemwinder lode claim, and such line produced indefinitely in its own direction north, 69° 40' west, marked on said Exhibit A, 'Amended south line of Stemwinder,' and a vertical plane drawn downward through the original north location line of said Stemwinder, and such line extended indefinitely in its own direction north, 72° 54' west, being the line marked on Exhibit A as 'Original north line of Stemwinder.' "

While disputes have been many, and seemingly bitter, between the present owners of the respective claims in question, and objections were made by some of the appellant's grantors to some of the lines and stakes of the Stemwinder, subsequent to its original and amended locations, it does not appear that such parts of the lines of either the original or amended Stemwinder claim as were laid upon the Emma and Last Chance ground were put there forcibly or surreptitiously or otherwise fraudulently or against the consent of the owners of either of those claims at the time. The same conditions appeared in the case between the present parties and others reported in 109 Fed. 538, 48 C. C. A. 665, where we said:

"The priority of location of the Emma over the Stemwinder claim is not only found as a fact by the court below, but is conceded by the plaintiff in error; and the plaintiff further concedes, not only in its brief, but in its complaint, that the Emma has the right to follow the vein in its dip between vertical planes drawn through its converging end lines to the point of their intersection. The underground segment of the vein included within the triangle formed by the prolongation of those two vertical converging end lines and the westerly side line of the Emma, as well as the surface and everything under the surface of the Emma claim, is thereby eliminated from controversy. Notwithstanding the location and rights of the Emma, the Stemwinder claim was so located as to include within its lines a considerable portion of the Emma surface. The lines of the Stemwinder that cross the vein are parallel, and are therefore, in law, the end lines of that claim, whether so intended by the locator at the time of its location or not. Mining Co. v. Tarbet, 98 U. S. 463, 25 L. Ed. 253; Argentine Min. Co. v. Terrible Min. Co., 122 U. S. 478, 7 Sup. Ct. 1356, 30 L. Ed.

1140; King v. Mining Co., 152 U. S. 222, 14 Sup. Ct. 510, 38 L. Ed. 419. No doubt, the owner of the Emma could have lawfully prevented any intrusion upon his claim, and have maintained the exclusive possession thereof. As said by the Supreme Court in Del Monte Min. & Mill. Co. v. Last Chance Min. & Mill. Co., 171 U. S. 55, 83, 18 Sup. Ct. 895, 43 L. Ed. 85: 'A party who is in actual possession of a valid location may maintain that possession and exclude every one from trespassing thereon, and no one is at liberty to forcibly disturb his possession or enter upon the premises. At the same time the fact is also to be recognized that these locations are generally made upon lands open, uninclosed, and not subject to any full actual occupation, where the limits of possessory rights are vague and uncertain, and where the validity of apparent locations is unsettled and doubtful. Under those circumstances, it is not strange—on the contrary, it is something to be expected, and, as we have seen, is a common experience—that conflicting locations are made, one overlapping another, and sometimes the overlap repeated by many different locations. And while in the adjustment of those conflicts the rights of the first locator to the surface within his location, as well as to veins beneath his surface, must be secured and confirmed, why,' asks the court, 'should a subsequent location be held absolutely void for all purposes, and wholly ignored? Recognizing it so far as it establishes the fact that the second locator has made a claim, and in making that claim has located parallel end lines, deprives the first locator of nothing. Certainly, if the rights of the prior locator are not infringed upon, who is prejudiced by awarding to the second locator all the benefits which the statute gives to the making of a claim? To say that the subsequent locator must, when it appears that his lines are to any extent upon territory covered by a prior valid location, go through the form of making a relocation, simply works delay, and may prevent him, as we have seen, from obtaining an amount of surface to which he is entitled, unless he abandons the underground and extralateral rights which are secured only by parallel end lines. In this connection,' continued the court, 'it may be properly inquired, what is the significance of parallel end lines? Is it to secure to the locator in all cases a tract in the shape of a parallelogram? Is it that the surveys of mineral land shall be, like the ordinary public surveys, in rectangular form, capable of easy adjustment, and showing upon a plat that even measurement which is so marked a feature of the range, township, and section system? Clearly not. While the contemplation of Congress may have been that every location should be in the form of a parallelogram, not exceeding 1,500 by 600 feet in size, yet the purpose, also, was to permit the location in such a way as to secure not exceeding 1,500 feet of the length of a discovered vein; and it was expected that the locator would so place it as, in his judgment, would make the location lengthwise cover the course of vein. There is no command that the side lines should be parallel, and the requisition that the end lines shall be parallel was for the purpose of bounding the underground extralateral rights which the owner of the location may exercise. He may pursue the vein downward outside the side lines of his location, but the limits of his right are not to extend on the course of the vein beyond the end lines projected downward through the earth. His rights on the surface are bounded by the several lines of his location, and the end lines must be parallel, in order that going downward he shall acquire no further length of the vein than the planes of those lines extended downward inclose. If the end lines are not parallel, then, following their planes downward, his rights will be either converging and diminishing, or diverging and increasing, the further he descends into the earth. In view of this purpose and effect of the parallel end lines, it matters not to the prior locator where the end lines of the junior location are laid. No matter where they may be, they do not disturb in the slightest his surface or underground rights.'

"The court accordingly answered in the affirmative this question propounded to it by the Circuit Court of Appeals for the Eighth Circuit: 'May any of the lines of a junior lode location be laid within, upon, or across the surface of a valid senior location for the purpose of defining for or securing to such junior location underground or extralateral rights not in conflict with any rights of the senior location?'

"In the case of the Hidee Gold-Mining Company, decided by the Secretary of the Interior January 30, 1901 (advance sheets), it was held that the location of a lode mining claim may even be laid within, upon, or across the surface of patented lode mining claims for the purpose of claiming the free 'and unappropriated ground within such lines and the veins apexing in such ground, and of defining and securing extralateral underground rights upon all such veins, where such lines are established openly and peaceably, and do not embrace any larger area of surface, claimed and unclaimed, than the law permits.

"As, therefore, upon the facts appearing, there was no valid objection to the Stemwinder location, the next question is, what rights did the owner of that location thereby secure? Confessedly, he acquired nothing as against the Emma, either on the surface or underground. But how is it as against the government and every subsequent locator? In the absence of any objection on the part of the owner of the Emma, the locator of the Stemwinder had, as we have seen, the legal right to extend his lines upon and across that claim. The ground to the north and south of the Emma was, according to the findings, open and unappropriated public land, with a mineral-bearing ledge passing in a northwesterly and southeasterly direction through the Emma and into the adjoining unappropriated public land to the north and south of that claim. Across that ledge and on unappropriated public land the locator of the Stemwinder laid his southerly end line, and along the course of the ledge and on unappropriated public land he laid his westerly side line. Across the ledge, partly on unappropriated public land and partly on the prior Emma location, he laid his northerly end line, parallel with his southerly end line, and along the course of the ledge, partly on the Emma and partly on unappropriated public land, he laid his easterly side line, almost, if not quite, parallel with his westerly side line. As, in the absence of any objection on the part of the owner of the Emma, the locator of the Stemwinder had the legal right to cross the prior location, his lines, as against the government and all subsequent locators, would therefore seem to have been perfectly laid. Under such circumstances, we are unable to see why, as against the government and all subsequent locators, the location should not carry precisely the same rights, surface and extralateral, that it would carry if none of the lines had been laid upon or over a prior location, which, under the statute governing extralateral rights, would give to the locator of the Stemwinder, as against the government and all subsequent locators, the right to follow the dip of the vein in its departure from the westerly side line of the claim indefinitely between vertical planes drawn through the parallel end lines extended indefinitely in their own direction. We think, too, that this is the logical deduction to be drawn from the reasoning upon which the judgment of the Supreme Court in the case of Del Monte Min. & Mill. Co. v. Last Chance Min. & Mill. Co., supra, was based. In effect, the court below made the south line of the Emma the north end line of the Stemwinder, thereby destroying the parallelism of the end lines of the Stemwinder fixed by its locator, and either destroying all of its extralateral rights entirely, or limiting them to converging lines intersecting at the point Y on the diagram. This is in conflict with what was held by the Supreme Court in the Del Monte Case in respect to the line, e, i, of the New York claim. That line, which was the northerly side line of the New York, stood in the same relative position to the Last Chance claim there involved as the south boundary of the Emma claim does to the Stemwinder; and the Supreme Court, in answer to the third question submitted to it by the Circuit Court of Appeals for the Eighth Circuit, held that the easterly side line of the New York did not constitute the end line of the Last Chance claim there in question. Locations of lode mining claims are made for the purpose of reaching the underground veins. 'The area of surface,' said the court in the Del Monte Case, 'is not the matter of moment. The thing of value is the hidden mineral below, and each locator ought to be entitled to make his location so as to reach as much of the unappropriated, and perhaps only partially discovered and traced, vein as is possible.' 171 U. S. 75, 18 Sup. Ct. 895, 43 L. Ed. 85."

It cannot, therefore, be now held, as claimed by the appellant, that no extralateral right pertains to the Stemwinder claim. Nor are we

able to agree with the appellant's counsel that the extralateral right of the Stemwinder should be bounded on the northerly side by a vertical plane drawn downward through the patented south line of the Emma claim because of the placing of the stone monument already referred to; and this for several reasons: First, it does not appear that the Stemwinder Mining Company, or its successor in interest, the appellee herein, knew anything about the stone monument, or the oral agreement under which it was built, at the time they acquired their interest; second, the monument was but one point, and was insufficient to indicate any boundary line; and, third, no connection is shown between the appellant and the Emma and Last Chance claims, or any of their owners or locators—there was no privity between them, or any of them.

Did the court below err, as against the intervening claims of the appellant, in fixing the bounding planes of the extralateral right of the Stemwinder through the original north line of the Stemwinder, and through its amended south line? By this decision, it will be seen, the court confined the extralateral right of the Stemwinder within the limits of its original location, and did not extend it beyond the planes of its amended location; and in confining it, as it did, to planes drawn through the northerly end line of the original location and the southerly end line of the amended location, it is given less of the vein on its dip than would be included within planes drawn through the end lines of its amended location. Was it right, in going back to the original north line of the Stemwinder, in fixing its extralateral right as against the intervening claims of the appellant? That question, it seems to us, depends upon whether or not the amendment of the location in question was an abandonment, for all purposes, of the original? If so, it would follow that the court below was in error in this particular. That there was no such intention on the part of the Stemwinder Mining Company was expressly declared in its notice of amended location, wherein it was stated that, the error in the course of the vein having been discovered—

"The object of this amended location is to conform to the laws relating to mining claims, both national and local, and to mark and define and record the same to the extent and with the boundaries hereinafter set forth, the same being within the boundaries so located, marked, and staked in the original location hereof, and not otherwise."

Again it is declared in the amended notice of location:

"It is further intended herein not to abandon in any manner or by implication any rights, privileges, property, possession, or title derived, originated, owned or held under the original location hereof; but that the purpose hereof is to more particularly mark, locate, define and describe the ground, vein, and premises held by said company, without waiving any rights under said original location, all of which the said company claims as the legal successor in interest and title and possession derived from said original locators."

At the time of the original location of the Stemwinder, none of the claims here set up by the appellant had been located. At the time of its location, it being supposed by its locator that the vein or lode outcropping within its surface boundaries ran in an easterly and westerly direction, and its then supposed side lines being, as a matter of fact, laid across the vein, and being substantially parallel, the law declares that

those which the locator called his side lines were in fact his end lines. Del Monte M. & M. Co. v. Last Chance M. Co., 171 U. S. 55, 18 Sup. Ct. 895, 43 L. Ed. 72; Last Chance M. Co. v. Tyler M. Co., 157 U. S. 683, 15 Sup. Ct. 733, 39 L. Ed. 859; Flagstaff M. Co. v. Tarbet, 98 U. S. 463, 25 L. Ed. 253; Argentine M. Co. v. Terrible M. Co., 122 U. S. 478, 7 Sup. Ct. 1356, 30 L. Ed. 1140; King v. Amy Silversmith M. Co., 152 U. S. 222, 14 Sup. Ct. 510, 38 L. Ed. 419; Bunker Hill & Sullivan M. & C. Co. v. Empire State-Idaho M. & D. Co., 109 Fed. 538, 48 C. C. A. 665; Empire M. & M. Co. v. Tombstone M. & M. Co. (C. C.) 100 Fed. 910; Cosmopolitan M. Co. v. Foote (C. C.) 101 Fed. 518; Tyler M. Co. v. Sweeney, 54 Fed. 284, 4 C. C. A. 329. And as they were laid, as the evidence shows, openly and aboveboard, without any forcible, clandestine, surreptitious, or otherwise fraudulent entry upon the ground of another, and without objection on the part of any one, the location of the Stemwinder thus made, carved out, as against the government, and any and every subsequent locator, a segment of the vein throughout its entire depth, which belonged to its locator. Del Monte M. & M. Co. v. Last Chance M. Co., 171 U. S. 55, 18 Sup. Ct. 895, 43 L. Ed. 72; Empire State-Idaho M. & D. Co. v. Bunker Hill & Sullivan M. & C. Co., 114 Fed. 417, 52 C. C. A. 219.

Unless the amended location of the Stemwinder operated as a total abandonment of the original, that segment of the vein, within the limits of the planes of the amended location, remains the property of the successors in interest of the original locator, against all persons not possessed of some prior right. That such amended location was not intended to operate as any such abandonment has already been shown by the express declarations of the notice of amended location above quoted; and that, as a matter of law, it was not an abandonment of the original location, is equally clear. Thompson v. Spray, 72 Cal. 528, 14 Pac. 182; Hallack v. Traber, 23 Colo. 14, 46 Pac. 110; McEvoy v. Hyman, 25 Fed. 596; Morrison v. Regan (Idaho) 67 Pac. 955; Duncan v. Fulton (Colo. App.) 61 Pac. 244.

The great width of the vein or lode in question is also again pressed upon our attention by the learned counsel for the appellant; extending, as he insists the evidence shows, beyond the west side line of the Stemwinder claim. In respect to this matter the court below said in its opinion:

"The defendant also maintains that the apex of this ledge is so wide that it extends far to the westward of the west line of the Stemwinder. Upon this subject there is much and some very interesting testimony by experienced and scientific mining men, but no one has been able to set definite limits to the ledge, and that it has no distinct hanging wall cannot be doubted. Its one distinct and persistent feature is its foot wall. It was the axis of action. Upon it the superincumbent mass of hanging country had its oscillating and grinding motion, resulting in the creation of that heavy selvage or gouge now found upon it, and in so shaking and breaking up that hanging country as to change the relation of its component parts; thus creating large masses of brecciated rock, fissures and cavities, through which the circulating mineral elements deposited their ores. It would be expected that those conditions would decrease as we advance from the line of fissure and action, until reaching a point where there had been no disturbance of the rocks. We would expect the evidence of mineralization to extend far beyond the ore deposits, and as far as the country had been disturbed, displaced, or brecciated, but we cannot conclude that the

legal hanging wall extends to the limits of these influences. It is a fact that in many ledges having a distinct hanging and foot wall, the country beyond either is more or less mineralized, and at times even small deposits of ore are found beyond the lines of the walls. Yet no miner would say that such mineralized country rock constituted a part of the ledge. It appears that in this ledge the foot-wall country has very little mineralization or even mineral stains. The reason is evident. The heavy gouge prevented the escape in that direction of the mineral elements, and the rocks having preserved their original compact formation, there were no cavities through which the mineral elements could circulate. To hold that the ledge extends to the extreme limits of all evidence of mineralization is not a reasonable or practicable proposition in such a formation as this. If not there, where then? Not beyond the ore deposit line, or where such strong indications of it are found that the miner could work or explore with the expectation of compensation. It cannot be doubted from the evidence that far beyond the line where any miner, acquainted with this formation, would work for ore, there is much evidence of mineralized rock, quite similar to the material recognized as clearly within the ledge. So far as can thus far be concluded from all the evidence of ore developments, at and within a reasonable distance below the surface in the Stemwinder, I doubt that the apex proper in that claim exceeds 250 to 300 feet in width. Suppose, however, that it does extend beyond the west line of the claim; the only effect would be, under the holding of the Court of Appeals in the King Case, 114 Fed. 417, 52 C. C. A. 219, that, if defendant owns that surface, it would own so much of the apex as lies within it. What its underground rights would be, is a problem I am not called upon to now solve."

We are not prepared to hold that the court below was in error in the view thus taken of the evidence in the cause. But if it be conceded that the vein or lode be as extensive in width upon the surface as contended by the appellant, the priority of the original Stemwinder location over the claims of the appellant here set up being established, the extralateral right of the appellee would remain as fixed and decreed by the court below. Last Chance M. Co. v. Bunker Hill & Sullivan M. & C. Co. (decided at the present term), 131 Fed. 579; Empire State-Idaho M. & D. Co. v. Bunker Hill & Sullivan M. & C. Co., 114 Fed. 417, 52 C. C. A. 219; St. Louis M. & M. Co. v. Montana M. Co., 104 Fed. 664, 44 C. C. A. 120, 56 L. R. A. 725. and cases there cited.

The judgment is affirmed.