# ANACONDA COPPER MIN. CO., RESPONDENT, v. PILOT BUTTE MIN. CO., APPELLANT.

(No. 3,700.)

(Submitted September 30, 1915. Decided October 4, 1915.)

[156 Pac. 409.]

*Mines and Mining — Extralateral Rights — Original and Secondary Veins—Common-law Rights—Injunction.*

Mines and Mining—Extralateral Rights—Common-law Rights—Injunction *Pendente Lite.*
  1.  Plaintiff owned the Badger and Emily claims, the former being the older location, both *prima facie* entitled to extralateral rights. The Badger State (or south) vein [see Diagram 4] as well as the Emily (or north) vein passed through the west end-line of the Emily and through its south side-line, the former at B and the latter at A, dipping to the north and uniting 900 feet below the surface, and from the point of union the united vein so far departed from a perpendicular on its descent into the earth that on the 1800-foot Badger State level it passed beyond the Emily north side-line and into territory beneath the surface of the Pilot claim, belonging to defendant. *Held*, on appeal from an order enjoining defendant from mining upon the united vein beneath the surface of its claim between a plane drawn through the Emily west end-line and a plane drawn through the Badger State east end-line projected north indefinitely, that the Badger State claim, being the older location, was entitled to the entire vein from the point of union by virtue of section 2336, United States Revised Statutes; that below the point of union the rights of the Emily claim were terminated by the plane B–F; that the ore within so much of the triangle B–C–F as lies beneath the surface boundaries of the Pilot claim belongs to defendant by virtue of its common-law rights, and that therefore the injunction order was too broad.  (See opinion on rehearing for modification.)

Same—Extralateral Rights—Extent.
  2.  The owner of a quartz lode mining claim asserting extralateral rights is entitled to only so much of the vein on its dip as he has apex within the surface boundaries of the claim.

Same—Continuity of Right.
  3.  One who seeks to follow a vein from the apex thereof within his lode mining claim, to ore beneath the surface of a claim adjoining, must have continuity of right.

Same—Extralateral Rights—Trespass.
  4.  The owner of a lode mining claim seeking to reach ore bodies underneath the location of another, by virtue of his right to follow extralaterally a vein apexing within his surface boundaries, cannot do so if, in order to accomplish his purpose, he must trespass upon intervening rights.

On the question of veins intersecting or uniting, see note in 50 L. R. A. 209; the right to follow a vein or lode on its dip beyond the surface lines of the location is discussed in an extensive note in 53 L. R. A. 491; and generally on the location of a mining claim, see note in 7 L. R. A. (n. s.) 765, page 842 discussing surface area thereof.

Same—Secondary Veins—Extralateral Rights.

5. (On rehearing.) The owner of a lode mining claim, if entitled to extralateral rights, may claim such rights not only upon the discovery but also upon the secondary veins found within its surface lines, at least for so much thereof as apex therein, the rights as to secondary veins not being confined to such veins as apex within the same segment of the claim in which the apex of the discovery vein exists; and while the end-lines of the claim are the end-lines of all veins apexing within the surface boundaries, the bounding planes for extralateral rights on the secondary veins, though required to be drawn parallel to the end-lines, need not be coincident.

[As to mineral veins and the right to follow them beyond lines, see note in 58 Am. St. Rep. 265.]

*Appeal from District Court, Silver Bow County; Jeremiah J. Lynch, Judge.*

ACTION by the Anaconda Copper Mining Company against the Pilot-Butte Mining Company. From an order granting an injunction *pendente lite,* defendant appeals. Remanded, with directions to modify order.

*Mr. John J. McHatton,* for Appellant, submitted a brief, as well as one in reply to that of Respondent, and argued the cause orally.

A consolidated ownership does not change rights. The Badger State owns the vein to the point of its crossing into that claim, to-wit, 100 feet southeasterly from the southwest corner of the Emily and 574 feet southeasterly from the northwest corner of the Badger State. Where its right ends the Emily right begins. Going from the west end-line of the Emily to the southeast, we meet the same point, the point where the Badger State's rights begin, and there the Emily rights cease. It must be evident that where one right begins the other ends. This being true, the Emily can have only 100 feet of length of the vein between the plane of its west end-line extended and a plane extended parallel thereto through this point.

The vein dips to the north. If the vein had happened to dip to the south, the rights of the two claims would be as we have indicated and beyond the contest of the plaintiff. When we come to consider end-line planes as limiting extralateral rights, the direction of the dip, whatever it may be, cannot enlarge the

rights acquired under the statutes of the United States. Where a vein passes through a side-line, the side-line becomes an end-line.

The end-line of a mining claim, either actual or projected, must remain the same. It is an established fact. The direction of the dip cannot change it. A drawn-in end-line has its place of location. In this case, where the vein begins to pass out of the Emily claim. A person can have no more of the vein on the dip than they have apex. (*King* v. *Amy & Silversmith Con. Min. Co.*, 9 Mont. 543, 24 Pac. 200.) In that case it is said where the vein departs fixes the point where the ''line is to be drawn.'' The same is said by the supreme court of the United States in that case on appeal. (Lindley on Mines, sec. 589; *Gilpin* v. *Sierra Nevada etc. Co.*, 2 Idaho, 696, 23 Pac. 547–1014; *Stewart M. Co.* v. *Ontario Min. Co.*, 23 Idaho, 724, 132 Pac. 787.) The same is held in *Fitzgerald* v. *Clark*, 17 Mont. 100, 52 Am. St. Rep. 665, 30 L. R. A. 803, 42 Pac. 273. In that case the point of departure of the vein from the junior into a senior location is fixed as the point through which to draw the end-line. This case confirms all that was said by the court with reference to this subject in *King* v. *Amy & Silversmith Con. Min. Co., supra.* The case cited in *Fitzgerald* v. *Clark*, amply supports the proposition that this point is the point where the right to the apex of the vein ceases in the junior location. Where the planes of the end-lines converge, it lessens the right as the vein comes down. (*Consolidated Wyoming G. M. Co.* v. *Champion M. Co.*, 63 Fed. 540; *Carson City G. & M. Co.* v. *North Star M. Co.*, 73 Fed. 597–602; affirmed by circuit court of appeals, 83 Fed. 658, 28 C. C. A. 333; *Central Eureka M. Co.* v. *East Central Eureka M. Co.*, 146 Cal. 147, 9 L. R. A. (n. s.) 940, 79 Pac. 834; affirmed, 204 U. S. 266, 51 L. Ed. 476, 27 Sup. Ct. Rep. 258.)

The intent of the Act of 1872 requiring parallel end-lines was to prevent the locator in following his vein downward acquiring a greater length underneath the surface than he had at the surface. (2 Lindley on Mines, 574, 575, citing the *Del Monte Case,* 171 U. S. 55, 43 L. Ed. 72, 18 Sup. Ct. Rep. 895;

*Doe* v. *Sanger,* 83 Cal. 203, 23 Pac. 365.)   Mr. Lindley refers to the case of *Bullion, Beck & Champion Co.* v. *Eureka Hill M. Co.,* 5 Utah, 3, 11 Pac. 515, and says that the older location being awarded the vein on its dip, there was nothing left for the junior location, although the end-lines are projected at different angles from those of the senior claim.   The decision of the circuit court of appeals in *Empire State-Idaho M. & D. Co.* v. *Bunker Hill & Sullivan M. & C. Co.,* 114 Fed. 417, 52 C. C. A. 219, is contrary to the foregoing.   It is also contrary to, and not supported by, the decision in *St. Louis M. & M. Co.* v. *Montana Co.,* 104 Fed. 664, 56 L. R. A. 725, 44 C. C. A. 120, and, of course, contrary to the decision of the trial court from which it came.   It is essentially contrary to the decision in *Lawson* v. *United States Min. Co.,* 207 U. S. 1, 52 L. Ed. 65, 28 Sup. Ct. Rep. 15.   The question in the present case is not controlled by the decision of the circuit court of appeals above referred to.   The fact is that the vein here being, according to plaintiff, a broad vein, enters on its footwall into the older, Badger State claim, at a distance of 574 feet from its north-west corner, and that going to the southeast it is bisected by the north side-line of the Badger and the south side-line of the Emily, which are coincident for a long distance, where it enters the Badger State entirely.

Now, the vein becomes the property of the Badger State claim both on its apex and dip from the point where the vein enters it.   From that point it ceases to be the Emily vein. That is the point where the east end-line of the Emily must be drawn, otherwise there is no virtue or force in the cases.   The apex belonging to the Badger State claim to that point, the Emily can have no greater length on the dip than it has from that point to its west end-line.

This court in its decision in the *Copper Trust Case, State ex rel. Anaconda C. M. Co.* v. *District Court,* 25 Mont. 504, 65 Pac. 1020, held that no right could be acquired through a prior right and also that the length of apex on the surface governed. This case is acknowledged by Mr. Lindley to be contrary to the Idaho cases and to the decision of the circuit court of appeals.

(2 Lindley, sec. 595, p. 1423.)  It supports our contention as against the contention of the respondent and the *Viola Case.* The question is settled by the decision in this state.

The rights of a vein passing through an end-line and then through a side-line are thoroughly well determined.  (See *Fitzgerald* v. *Clark,* 17 Mont. 100, 52 Am. St. Rep. 665, 30 L. R. A. 803, 52 Pac. 273; *Del Monte M. & M. Co.* v. *Last Chance M. & M. Co.,* 171 U. S. 55, 43 L. Ed. 72, 18 Sup. Ct. Rep. 895; *Tyler Mining Co.* v. *Sweeney Mining Co.,* 54 Fed. 284, 4 C. C. A. 329; *Consolidated Wyoming Gold M. Co.* v. *Champion M. Co.,* 63 Fed. 540; *Tyler M. Co.* v. *Last Chance M. Co.,* 71 Fed. 848.)

*Messrs. L. O. Evans, W. B. Rodgers, D. Gay Stivers* and *D. M. Kelly,* for Respondent, submitted a brief; *Mr. Evans* argued the cause orally.

Appellant's contention that the locator and developer of a vein, which in its depth is found to unite with another vein belonging to an older location, loses his extralateral rights beyond the extralateral rights of the older claim upon the vein, has never been upheld or intimated to be correct by any court so far as we can discover.  Such a case as that of the Emily, where the Emily vein was properly subject to location within that claim, there being the apex of a vein or veins answering the requirements of our mining law, would afford a much clearer case of extralateral rights, subject only to the rights of a senior location upon a vein joining with the Emily vein in depth, than if the Emily vein were a broad vein, the apex of which was divided with the Badger State claim, by the common side-line, as in that case, under the law, the Badger State would take the entire vein upon its dip between its end-lines, leaving the Emily only the surface of the portion of the apex lying within its lines; so that if, under our mining law, the locator of a junior claim, upon a divided apex, would have extralateral rights, only limited by the rights of the senior location, then in principle similar extralateral rights must be granted without question to the locator of a vein independent and separate from the surface to a point where it unites in depth with the vein of the older location.

. That a junior claim has full extralateral rights after the rights of the senior claim have been satisfied in the case of a longitudinally bisected vein has been determined by a court of eminent authority upon our mining law. (*Empire State-Idaho M. & D. Co.* v. *Bunker Hill & Sullivan M. & C. Co.*, 114 Fed. 417, 52 C. C. A. 219.)   Prior to the decision in this case, the court held in the case of *St. Louis Mining & Milling Co.* v. *Montana Mining Co.*, 104 Fed. 664, 56 L. R. A. 725, 44 C. C. A. 120, a decision which was subsequently followed by the supreme court of the United States in *Lawson* v. *United States Mining Co.*, 207 U. S. 1, 52 L. Ed. 65, 28 Sup. Ct. Rep. 15, that where the apex of a vein was bisected in this manner, by a side-line, that the older location, as against the junior, took the entire vein between its end-line planes.

Previous to the decision of the circuit court of appeals in the *St. Louis Case,* there had been some divergence of opinion in the courts as to the extralateral rights of the respective claims under such circumstances.   Judge Hallett in the *Hall-Equator Case* had held that no extralateral rights were obtained unless a locator included within his location the entire apex.   The court of appeals of Colorado had made a similar holding.   The supreme court of Utah, in the case referred to in appellant's brief, *Bullion-Beck etc. Co.* v. *Eureka Mining etc. Co.*, 5 Utah, 3, 11 Pac. 515, had held to the contrary, and in accordance with the decision of the court·of appeals in the *St. Louis Case.*

Every point advanced by appellant's counsel in this case is answered adversely to appellant by the decision in the *San Carlos-Viola Case* (114 Fed. 417, 52 C. C. A. 219), and practically every contention suggested by appellant here was advanced by Judge Beatty, in his decision in the *San Carlos Case,* and logically met and overruled by the court of appeals.   Excepting the decision of the lower court in this case, we have not been able to find any decision holding or even intimating that this decision is not correct.   It is referred to, apparently with approval, in Lindley on Mines, third edition, section 583, and is followed and cited by the circuit court of appeals in later cases, *viz.: Empire State Co.* v. *Bunker Hill*

*Co.,* 121 Fed. 973, 58 C. C. A. 311, and *Last Chance Co.* v. *Bunker Hill Co.,* 131 Fed. 579, 66 C. C. A. 299, in both of which cases a review was denied by the supreme court of the United States.  In its decision in the *Lawson Case,* which went merely to the extent of holding, as did the court of appeals in the *St. Louis Case,* that as against the junior location the senior location took the entire lode within the planes of its end-lines properly located, the supreme court of the United States cites this decision in the *San Carlos-Viola Case.*

The decision of the circuit court of appeals in the *San Carlos Case* was considered by Judge Marshall in the circuit court of the district of Utah in the case of *Wall* v. *United States Min. Co.,* decided September 4, 1905, where the controversy justified the application of a similar doctrine.  Judge Marshall plainly conceded the correctness of the decision of the circuit court of appeals in the *San Carlos Case.*  Judge Marshall there said:

"There is no reason to doubt the correctness of this latter decision."

It is contended in counsel's brief that the court in the case of *Bullion-Beck etc. Co.* v. *Eureka Hill etc. Co.,* 5 Utah, 3, 11 Pac. 515, held that the older location took the entire vein and left nothing for the junior location, although its end-lines were projected at different angles from those of the senior claim. This decision of the Utah court shows that the question of the rights of the junior claim on the dip, beyond where the rights of the senior claim ceased, was not involved or discussed at all. The decision was simply to the effect that as against the junior claim, the senior took the entire vein.

Counsel claims that the decision of the lower court is in direct conflict with the decision of this court in the case of *State ex rel. Anaconda Copper Min. Co.* v. *District Court,* 25 Mont. 504, 65 Pac. 1020, known as the *Copper Trust Case.*  There is no similarity whatever between the two cases.  In that case only a small triangular piece of ground ten feet in width at its base and seventy-five feet long, between claims which had long been patented, was open to location.  The extreme extent of apex

claimed for this fraction was less than seventy-five feet, and based upon a location upon this tract and another small triangular tract remote therefrom, which did not enter into the decision to any substantial extent, the locator of the Copper Trust claim claimed underground rights upon the vein, which in the extreme covered in length a portion of the vein at depth for about 1500 feet. This court simply held that underground rights could not be obtained without corresponding surface and apex rights, and that the extent of the apex within the ground open to location fixed the limit of length granted upon the vein upon its dip.

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

This appeal presents for review an order of the district court granting an injunction *pendente lite.* The plaintiff is the owner of the Badger State and Emily claims, and the defendant owns the Pilot claim to the north. The situation of these claims and the question propounded for solution are best illustrated by the subjoined diagrams, which are sufficiently accurate for all purposes of this appeal.

FIG. 2.

FIG. 3.

As between the Badger State and the Emily, the former is the senior location. Each of these claims was originally located so that it is entitled, *prima facie*, to extralateral rights. There is some controversy as to whether there is in fact one broad vein or at least two distinct veins; but the trial court found generally for the plaintiff, and for the purposes of this appeal we shall assume, without deciding, that plaintiff's theory of distinct veins is correct.

The south vein, hereafter referred to as the Badger State vein for convenience only, passes through the Emily west end-line

and through the south side-line into the Badger State at the point B. The north vein, which will be designated the Emily vein, likewise passes through the Emily west end-line and through the south side-line into the Badger State at A (Fig. 1). These veins dip to the north and about 900 feet below the surface unite on the dip, and from that point the one vein so far departs from a perpendicular on its descent into the earth that, in the neighborhood of the 1,800-foot Badger State level, it passes beyond the Emily north side-line and into territory beneath the Pilot surface. The trial court enjoined the defendant from mining upon this vein beneath the Pilot between a plane drawn through the Emily west end-line and a plane drawn through the Badger State east end-line projected north indefinitely. By eliminating all other questions which we deem inconsequential, we have for determination the single inquiry: Was the order justified?

The plaintiff does not attempt to defend the order in terms, but insists that if the planes as drawn were employed merely as a convenient means of describing the territory to be protected, and if the defendant is not injured thereby, the order should be affirmed, even though there cannot be any justification, from a technical point of view, for projecting the planes as was done in the order, and of the correctness of this there cannot be any question.

The first contention of plaintiff is that the Badger State is [1, 2] entitled to extralateral rights on the Badger State vein under the Pilot surface between a plane through the Badger State east end-line projected north indefinitely, and a plane parallel thereto drawn through point B, and for the purposes of this appeal defendant concedes this contention.

Plaintiff insists, further, that the Emily is entitled to extralateral rights on the Emily vein beneath the Pilot surface between a plane drawn through the Emily west end-line D, E, projected north indefinitely, and a plane parallel thereto drawn through A, C (Fig. 1). The defendant's theory is that the right of the Emily to follow the vein under the Pilot surface is

limited between a plane drawn through the Emily west end-line D, E, and a plane parallel thereto drawn through B, F (Fig. 2). Figure 1 illustrates the plaintiff's view, figure 2 the theory of defendant, and figure 3 is a cross-section showing the union of the two veins, and the dip of the consolidated vein. If the Emily rights be established in harmony with plaintiff's contention, then the defendant is not injured by the order as made. If, on the other hand, defendant's theory is correct, the order is too broad, for a triangle formed by lines drawn through B, C, F (Fig. 2) is not included within the extralateral rights of either of plaintiff's claims and should be exempted from the operation of the injunction, leaving the Pilot free to prosecute its mining operations within so much of the triangle as lies within its surface boundaries, upon the theory that the ores therein belong to it by virtue of its common-law rights.

It is claimed for the contention of the plaintiff that it is warranted by the express language of section 3 of the Act of May 10, 1872 (Chap. 152, 17 Stat. 91, U. S. Rev. Stats., sec. 2322), and by the construction given that statute by federal courts in cases presenting like questions. The effect of the statute invoked is that discovery upon a vein which cuts at least one of the parallel end-lines of a claim and has its apex within the surface lines of the claim extended downward vertically, gives to the locator exclusive possession of the surface and of all veins, lodes and ledges therein throughout their entire depth, although such veins, lodes or ledges so far depart from a perpendicular in their course downward as to extend outside the vertical side-lines of such location.

It is immaterial to this discussion whether the Badger State vein, as we have denominated the south vein, is the discovery or a secondary vein in the Badger State claim, or whether the Emily discovery was upon the Emily vein, as we denominate the north vein. Upon the assumption that the Emily claim has within its surface boundaries 600 feet or more of the apex of the Emily vein, the language of the statute above is invoked to justify the Emily in claiming extralateral rights along that vein

for an equal number of feet beneath the Pilot surface below the 1,800-foot level, notwithstanding the union of the Badger State and Emily veins above the point where the Emily north side-line is crossed by the consolidated vein. If the provision of section 2322 above was the only applicable statute, the correctness of the plaintiff's position would afford reasonable ground for debate; but the history of our mining laws and the construction which we deem it necessary to give to the entire Act of May 10, 1872, remove the question presented upon this appeal from the realm of doubt.

The common law would give to each of these claims all ore bodies beneath its surface. The right which a locator has to follow his vein on its dip beneath the surface of another claim is purely of statutory origin. The statute is but the outgrowth of mining rules and regulations in force in California, Nevada and other western territory, before the Congress enacted the first statute in 1866; and these rules and regulations were largely the result of the application to existing conditions of the Spanish ordinances in force in Mexico, with possibly some ideas borrowed from the customs of the High Peak of Derbyshire and the laws of Prussia. They were enforced *ex necessitate* and received recognition from the courts and the Congress. As applied to quartz mining, they uniformly awarded to the locator a claim of a certain number of feet along the vein, with the right *to follow the vein* on its dip into the earth *ad libitum.* In recognition of the binding force of these regulations and as supplementary thereto, the Congress enacted the first Mining Code in 1866 (14 Stats. at Large, p. 251). Section 2 of that Act furnished a procedure for obtaining patent, and declared that when issued the patent should convey to the claim owner "such mine together with *the right to follow such vein or lode* with its dips, angles and variations *to any depth,* although it may enter the land adjoining, which land adjoining shall be sold subject to this condition." Section 4 repeats this language in substance. Nothing whatever is to be found in the Act or in the local rules and regulations, so far as our investigation

goes, as to the relative rights of each of two locators whose veins united on the dip beneath the earth's surface. When such a condition arose, it was necessary to make an equitable division of the vein at and below the point of union, or the right of one claimant had to yield to the paramount right of the other. The theory of a division of the vein never found favor with the miners or with the courts, but the maxim, "First in time is strongest in right," was applied in the absence of express statutory enactment to the contrary. When the Act of 1872 above was passed, the subject was placed beyond the pale of controversy, by crystallizing the maxim into statutory law. Section 2336, United States Revised Statutes, provides: "And where two or more veins unite, the oldest or prior location shall take the vein below the point of union, including all the space of intersection." If the early miner was led to believe that the right to follow his discovery vein on the dip between the planes of his end-lines was absolute, he was soon disabused of his illusion. If his vein dipped beneath his side-line into prior patented agricultural land, he discovered that his right was cut off and that the common law interposed to stay his mining operations. (*Amador Medean Gold Min. Co.* v. *South Spring Gold Min. Co.* (C. C.), 13 Sawy. 523, 36 Fed. 668.) If in pursuing his vein on the dip he came into contact with the asserted right of a prior locator on the same vein, the maxim "First in time is strongest in right" took from him that which he assumed to be his own and gave it to the older location. (*Tyler Min. Co.* v. *Sweeney*, 79 Fed. 277, 24 C. C. A. 578; *Tyler Min. Co.* v. *Last Chance Min. Co.* (C. C.), 71 Fed. 848.) So, likewise, if on the dip his vein united with the vein of a prior locator, he was made to realize most forcibly that from the point of union his rights ceased. Whatever may be said of the wisdom of the maxim above or of the policy of section 2336, the regulation in the one instance, and the statute in the other, embody the law as it is now and as it has been since the first quartz claim was located in this western country, and impose upon the courts the duty to apply the rule, regardless of consequences.

In the present instance, the Badger State and Emily veins unite above the point where Pilot territory is encountered, and many feet above the ore bodies in dispute. If section 2336 has any meaning at all, it is that from the point of union and down, the Badger State claim takes the entire vein. The Emily vein is terminated at the point of union as effectively as though the mineralization of the ground at that point ceased. Below the point of union there is not any Emily vein whatever. To give to the statute any other meaning is to interpolate something not found in the express terms or implied from anything suggested in either section 2336 or in the context.

The doctrine of extralateral rights had its origin in the theory that it is the vein which is actually located, and that the surface is a mere incident, necessary for the convenient development of the mine. The right as expressed in the early mining rules and regulations and in the Act of 1866 was the right *to follow the vein* on its dip to any depth; and we assert confidently that though the language employed in section 2322 above is somewhat different, it was intended to convey the same idea. If in this conclusion we are correct, the Emily has no extralateral rights east of point B, because it has no vein below the point of union which it can follow to the ore in dispute. From 1 to 2 (Fig. 3) the entire vein belongs to the Badger State and is a part and parcel of that claim. The Emily has no greater right between those points than an entire stranger, and to reach the ore bodies in dispute at 2 (Fig. 3), it must trespass upon either the Badger State or the Pilot claim. To say that it has a right which can be exercised only by committing a wrong is a contradiction of terms.

It is conceded by plaintiff, as it must be, that the right which it has by virtue of its ownership of the Emily claim is not enhanced by its common ownership with the Badger State claim, and that the Emily's rights are to be determined as though the Badger State claim was owned by a hostile stranger.

In support of our position that at and below the point of union, the Badger State owns the entire vein, we need appeal

only to the plain language of section 2336 above. (*Champion Min. Co.* v. *Consolidated Wyo. G. Min. Co.*, 75 Cal. 78, 16 Pac. 513; *Little Josephine Min. Co.* v. *Fullerton*, 58 Fed. 521, 7 C. C. A. 340; 27 Cyc. 587.)

By some of the courts and text-writers it is said that to entitle [3] a claimant to extralateral rights there must be continuity of vein from the apex to the ore in dispute; by others that there must be identity of vein. It is of little moment here which of these statements is correct; but that there must be continuity of right in the locator who seeks to follow a vein from the apex within his claim to the ore beneath the surface of another claim is in effect the holding of this court, and its correctness in our judgment cannot be gainsaid.

In *State ex rel. Anaconda C. Min. Co.* v. *District Court*, 25 Mont. 504, 65 Pac. 1020, there was presented the contention of O'Connor that by virtue of his ownership of a portion of the apex of a vein which cut the parallel end-lines of his Copper Trust claim, he should be entitled to the ore within a triangle under the surface of the Rob Roy, notwithstanding the rights of the St. Lawrence and Smoke Stack claims intervened and severed the vein between the Copper Trust apex and the ore in dispute. This court denied the claim and stated the rule of continuity of right in a single sentence: "O'Connor has no part of the apex of the vein so situated with reference to the ore bodies within the triangle that he may pursue the vein from the surface." O'Connor had the same right—if it could be called a right—to follow the vein from its apex in the Copper Trust through the Smoke Stack and St. Lawrence claims to the ore in controversy, as the Emily has to follow from the apex of its vein down the consolidated vein to the ore bodies beneath the Pilot surface, for the consolidated vein belongs to the Badger State and is as much a part of that claim as the vein beneath the St. Lawrence in the Copper Trust Case was a part of the [4] St. Lawrence claim. The only means by which O'Connor could reach the ore he claimed beneath the surface of the Rob Roy was by trespassing upon the intervening claims, and the

only access which the Emily has to the ore in controversy here is by trespassing upon the Badger State or Pilot, or both of them. In the language of this court above, it has no part of the apex of the Emily vein so situated with reference to the ore bodies in dispute that it may pursue the vein from the surface. The Badger State owns all the vein east of point B and below the union of the two veins, and presents an impassable barrier to the extralateral rights claimed by the Emily.

These views do not accord with the decisions of certain courts to which our attention is directed. In *Roxanna G. Min. & T. Co.* v. *Cone* (C. C.), 100 Fed. 168, Judge Hallett, without citing any authority to support his view, orally expressed the opinion that as between a junior locator whose vein unites on the dip with the vein of a senior locator, and the complainant whose claim contains no part of the apex of either vein, the junior locator has extralateral rights on the consolidated vein beneath the surface of complainant's claim, in ground not reached by the extralateral rights of the senior locator. It does not appear from the report whether any consideration was given by court or counsel to the common-law rights of the complainant, and we must content ourselves with a respectful dissent from Judge Hallett's conclusion.

Upon parity of reasoning, plaintiff's theory finds further support in certain decisions by the circuit court of appeals for the ninth circuit, in cases arising in the Coeur d'Alene district of Idaho. In *Bunker Hill & Sullivan M. & C. Co.* v. *Empire State-Idaho M. & D. Co.*, 109 Fed. 538, 48 C. C. A. 665, in what is known as the first *Stemwinder Case,* the court defined the extralateral rights to which the Stemwinder claim would have been entitled but for its failure to adverse the application of the Last Chance claim for patent. By that *dictum* it was intimated that the Stemwinder claim might assert extralateral rights upon the dip of the vein between the planes of its parallel end-lines, subject only to the superior rights of the Emma and Last Chance claims, even though it had the apex for only a portion of the distance between its end-lines. The court con-

ceived this to be the logical deduction to be drawn from the decision in *Del Monte M. & M. Co.* v. *Last Chance M. & M. Co.*, 171 U. S. 55, 43 L. Ed. 72, 18 Sup. Ct. Rep. 895.

In *Bunker Hill & Sullivan M. & C. Co.* v. *Empire State-Idaho M. & D. Co.* (C. C.), 134 Fed. 268—the second *Stemwinder Case* arising out of conflicting interests asserted by the Stemwinder claim on the one hand, and the Viola and San Carlos claims on the other—Judge Beatty, in granting an injunction *pendente lite,* in effect awarded extralateral rights to the Stemwinder between planes drawn through its parallel end-lines projecting westwardly indefinitely, notwithstanding its limited amount of apex and the fact that the vein between the apex and the ore bodies in dispute belonged to the Emma and Last Chance claims. Judge Beatty apparently felt bound by the *dictum* in the first *Stemwinder Case,* but expressed his opinion that the conclusion was not warranted by anything found in the Del Monte decision.

In *Empire State-Idaho M. & D. Co.* v. *Bunker Hill & Sullivan M. & C. Co.,* 114 Fed. 417, 52 C. C. A. 219, there was involved the question of the extralateral rights of the Viola and San Carlos, adjoining claims having a common side-line which split the broad vein upon which each claim was located. The Viola was prior to the San Carlos and both were prior to the King location. The court held that as between the Viola and San Carlos, the former took the entire vein on its dip between the planes of its parallel end-lines extended indefinitely in their own direction, but that as between the San Carlos and the King, the former had extralateral rights on the vein between planes drawn through its parallel end-lines projected in their own direction, subject only to the superior rights of the Viola claim.

In *Wall* v. *United States Min. Co.,* 232 Fed. 613, Judge Marshall, sitting in the circuit court for the district of Utah, expressed himself satisfied with the conclusion reached in the *Viola Case.*

In *Empire State-Idaho M. & D. Co.* v. *Bunker Hill & Sullivan M. & C. Co.,* 121 Fed. 973, 58 C. C. A. 311, the court ap-

proved Judge Beatty's order granting an injunction in the case referred to above. In the course of the opinion, reference was made to the decision in the *Viola Case,* and the court said: "The Viola extralateral right did not wholly intervene at any point to cut off the ore body to which the San Carlos had the extralateral right; in other words, there was in that claim upon the outcrop of the ledge in the surface location a point from which the owners of the San Carlos could, without interruption and continuously, proceed on the ledge on its downward course to the full extent of the extralateral right awarded by the court." The court then disposed of the case in hand upon what it deemed an analogy found in the federal statute, and held that, though the vein upon which the Stemwinder claim asserted extralateral rights was completely severed between the apex and the ore in dispute by the prior rights of the Emma and Last Chance claims, still the Stemwinder had extralateral rights on the vein beyond the plane where the Emma and Last Chance rights ceased, and in support of this view observed: "If the vein upon which the Stemwinder is located were in fact a separate vein from that on which the Last Chance is located, but passed through the latter in the same direction in which extralateral rights are claimed in the present suit, there could be no doubt of the right of the owner of the Stemwinder to pursue the vein beyond the point of intersection, and to maintain a right of way through the vein of the Last Chance at the point of intersection. We see no reason why that right, which is so recognized by the statute, and which would probably be recognized in the absence of a statute, shall be denied when the point of intersection of extralateral rights is not upon separate veins, but upon the same vein." When the case was reached upon its merits, these views were reasserted. (131 Fed. 591, 66 C. C. A. 99 ) An appeal to the supreme court of the United States was dismissed (200 U. S. 613, 50 L. Ed. 620, 26 Sup. Ct. Rep. 754), and a petition for *certiorari* was denied (200 U. S. 617, 50 L. Ed. 622, 26 Sup. Ct. Rep. 754).

We agree with Judge Beatty that there is not anything to be found in the Del Monte decision to justify the *dictum* found in the first *Stemwinder Case,* which is contrary to the holding of this court in *Fitzgerald* v. *Clark,* 17 Mont. 100, 52 Am. St. Rep. 665, 30 L. R. A. 803, 42 Pac. 273, to the effect that a locator can have but the same number of feet along the vein beneath the surface as he has at the apex. To the same effect is *Tyler Min. Co.* v. *Last Chance Min. Co.,* above. While we do not assent to the reasoning advanced in the Viola decision, the conclusion that, as between the San Carlos and the King, the former owned the particular ore body in dispute, may be warranted by the fact, as suggested by the court above, that the San Carlos owned a part of the apex of the vein, which was not severed from the ore in dispute by the superior right of the Viola. We are unable to agree with either the conclusion or the reasoning of the circuit court of appeals in the second *Stemwinder Case.* The Stemwinder could reach the ore in dispute only by trespassing upon the Last Chance claim, and we decline to sanction the doctrine that a right may be exercised by the commission of a wrong. The ground of the learned court's opinion is altogether untenable. There is not any semblance of a parallel between the right which a locator has to a right of way through the point of intersection of crossed veins, and the wrong which the Stemwinder claim was forced to commit to reach the ore involved in that controversy. In the absence of statute, the junior locator could not reach the ore beyond the point where his vein crossed the vein of the senior locator, without committing a trespass; but by virtue of the express language of section 2336, and not otherwise, his act which would be wrongful is given the sanction of law. That section provides: "Where two or more veins intersect or cross each other, priority of title shall govern, and such prior location shall be entitled to all ore or mineral contained within the space of intersection; but the subsequent location shall have the right of way through the space of intersection for the purposes of the convenient working of the mine." In other words, the government has carved out of the estate of the senior locator an ease-

ment or right of way through the point of intersection of crossed veins, in favor of the junior locator; but the government did not make any such reservation through the Last Chance claim, and with all due respect to the circuit court of appeals, we assert that it had no authority to make the reservation for the government. The decision can find support only in what appears to us to be purely judicial legislation.

It cannot be said that the refusal of the United States supreme court to entertain the appeal or its dismissal of the petition for *certiorari* is tantamount to an affirmance of the judgment rendered; for in *Lawson* v. *United States Min. Co.*, 207 U. S. 1, 52 L. Ed. 65, 28 Sup. Ct. Rep. 15, the court held directly contrary to the decision in the first *Stemwinder Case* upon the question of the extent of the estoppel created by the failure of the Stemwinder to adverse the application of the Last Chance for patent, though it had previously refused the Stemwinder's petition for *certiorari* to have that question reviewed.

So far as they are involved in this appeal, the rights of the Emily attach where those of the Badger State cease, and by virtue of its ownership of the apex from its west end-line to point B, it is entitled to extralateral rights beneath the surface of the Pilot between a plane projected through its west end-line to the north indefinitely, and a plane parallel thereto drawn through the points B, F (Fig. 2). (*Fitzgerald* v. *Clark*, above, affirmed in 171 U. S. 92, 43 L. Ed. 87, 18 Sup. Ct. Rep. 941.)

The triangle formed at B, C, F (Fig. 2) is not included within the rights of either of plaintiff's claims, and the ore within so much of that triangle as lies beneath the surface boundaries of the Pilot belongs to that claim by virtue of its common-law rights. (*Parrot S. & C. Co.* v. *Heinze*, 25 Mont. 139, 87 Am. St. Rep. 386, 53 L. R. A. 491, 64 Pac. 326.)

The cause is remanded to the district court with direction to modify the injunction order to conform to the views herein expressed.

*Remanded, with directions.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE SANNER concur.

ON REHEARING.

(Submitted January 5, 1916.   Decided March 20, 1916.)

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

A rehearing was granted in this case for two reasons, *viz.:* (1) That the court was willing to hear further argument upon the question whether the right of the plaintiff to the extra-lateral portion of the Emily or Badger vein should be bounded to the east by the plane of the line A, C, or the plane of the line B, F (Fig. 4), as was held in the original opinion; and (2) that we were in doubt as to whether, assuming as correct the conclusion that the order of the district court was too broad, we did not too narrowly limit plaintiff's right upon the north vein to the east.

FIG. 4.

As regards the first question, we have concluded to adhere to the rule adopted and made the basis of the decision in *State ex rel. Anaconda C. M. Co.* v. *District Court,* 25 Mont. 504, 65 Pac. 1020, as more clearly within the purview and meaning of the federal statute than that adopted in the Stemwinder and

other cases based upon the same line of reasoning, cited and examined in the former opinion. We shall not enter again upon a discussion of this branch of the case.

The evidence discloses that the Emily discovery was made on [5] that portion of the vein referred to in the former opinion as the Badger vein to the west of the line B, C. There is also evidence tending to show that the branch to the north is a separate vein, until, upon its descent to near the 900-foot level of the Badger, it unites with the Badger vein. On this point the evidence is in conflict. Inasmuch as the trial court found all the issues for the plaintiff, we are justified in assuming that it found this issue in its favor also. Adopting this assumption for the purpose of this appeal, we have in the Emily a secondary vein, the apex of which is several hundred feet longer in extent than that of the discovery or original vein, and the question arises whether the extralateral rights of the plaintiff on this vein are properly limited toward the east by the plane of the line B, F, or should be limited by the plane of the line drawn parallel with B, F, from the point K, at which the line of the union of the two branches on the dip (indicated by the irregular line extending east from this point) crosses the line B, C, on the 900-foot level.

The significance of the condition presented by the facts thus assumed was not pressed upon our attention at the former hearing and was not considered. Under section 2322, United States Revised Statutes, the locator is granted the right to all veins, lodes, and ledges throughout their entire depth, the top or apex of which lies within the vertical planes of his surface lines, with the right to follow them on their dip to their utmost depths, even though they depart beyond the vertical planes of the sidelines, provided the end-lines are parallel as required by section 2320. Thus all veins are made of equal dignity, and extralateral rights upon secondary veins, if they are so situated with reference to the parallel end-lines that extralateral rights attach at all, are to be measured by the same rule as are the rights upon the discovery or original vein. The length of the apex

intercepted by the planes of the end-lines will be the extreme limit of the rights upon the original vein. So must the rights on the secondary vein be limited, whether the segment of it intercepted in like manner be longer or shorter than the segment of the original vein. This was assumed in *Del Monte Min. & M. Co.* v. *Last Chance M. & M. Co.*, 171 U. S. 55, 43 L. Ed. 72, 18 Sup. Ct. Rep. 895, to be the meaning of the statute, and all the courts, so far as they have considered it, have so interpreted it in adjusting conflicting rights in particular cases. In *Iron Silver Min. Co.* v. *Elgin Min. Co.*, 118 U. S. 196, 207, 30 L. Ed. 98, 6 Sup. Ct. Rep. 1177, 1183, it was said: "It often happens that the top or apex of more than one vein lies within such surface lines, and the veins may have different courses or dips, yet his [the owner's] right to follow them outside of the side-lines of the location must be bounded by planes drawn vertically through the same end-lines. The planes of the end-lines cannot be drawn at a right angle to the courses of all the veins if they are not identical." As was pointed out by Mr. Justice De W:tt in *King* v. *Amy & Silversmith Con. Min. Co.*, 9 Mont. 543, 24 Pac. 200, the planes of the end-lines fix the direction of the extralateral rights from the point at which the vein is cut off along the strike because of its departure through a side-line or for any other cause. The fact that the planes bounding the rights along the original vein may under this rule be fixed in different places from those bounding the rights on the secondary vein, does not enlarge or lessen the rights which attach to the latter. The courts which have had occasion to consider the subject have, either in effect or by direct expression, adopted this view. (*Walrath* v. *Champion Min. Co.*, 171 U. S. 293, 43 L. Ed. 170, 18 Sup. Ct. Rep. 909; *Consolidated Wyo. G. Min. Co.* v. *Champion Min. Co.*, (C. C.), 63 Fed. 540; *Walrath* v. *Champion Min. Co.* (C. C.), 63 Fed. 552; *Ajax G. Min. Co.* v. *Hilkey*, 31 Colo. 131, 102 Am. St. Rep. 23, 62 L. R. A. 555, 72 Pac. 447; *Montana Min. Co.* v. *St. Louis M. & M. Co.*, 102 Fed. 430, 42 C. C. A. 415; *Id.*, 104 Fed. 664, 44 C. C. A. 120, 56 L. R. A. 725; *Id.*, 183 Fed. 51, 105 C. C. A.

343; *Work Min. & M. Co.* v. *Doctor Jack Pot Min. Co.,* 194 Fed. 620, 114 C. C. A. 392; see, also, Lindley on Mines, secs. 593, 594, with accompanying diagrams.) In *Ajax G. Min. Co.* v. *Hilkey, supra,* the court states its conclusion as follows: "Our con- clusion is that for all veins, both discovery and secondary, of a patented claim, the owner has extralateral rights, at least for so much thereof as apex within the surface lines; that such rights as to secondary veins are not confined to such veins as apex within the same segment of the claim in which the apex of the discovery vein exists; and while the end-lines of the loca- tion, as fixed and described in the patent, are the end-lines of all veins apexing within the surface boundaries, and may con- stitute the bounding planes for such extralateral rights, and in no case can the locator pursue the vein on its dip outside the surface lines beyond such planes continued in their own direc- tion until they intersect such veins, yet these bounding planes, which in all cases must be drawn parallel to the end-lines, need not be coincident." This seems to be the obvious result of the rule that the extralateral rights are to be measured by the length of the apex found within the boundaries of the claim. Of course, below the point of union the Badger takes the vein, but no farther west than the line B, C; and since there is within the Emily claim a portion of the apex of the united vein which is not taken by the Badger, the portion of the united vein at- taching to this apex must of necessity belong to the Emily. If the Badger were not the senior location, the rights of the Emily would be limited to the east by the line A, C. Now, ap- plying the formula suggested by Mr. Lindley (Lindley on Mines, sec. 594, p. 1394), and subtracting the rights of the Badger, the rights of the Emily on the south vein are obviously to be limited to the east by the line B, F, and on the north vein by the line J, L. The accident of the union of the two branches becomes of significance only when the right to the united vein is the subject of inquiry. This inquiry is to be determined by an ascertainment of the fact of priority of location. (U. S. Rev. Stats. 2336.) This question aside, the locator who has

any part of what may be regarded as the apex of the united vein must of necessity be deemed the owner of the extralateral rights on the portion not taken by the senior locator, because there is no other person who can make legal claim to it.

The cause is remanded to the district court, with directions to modify the injunction order to conform to the views herein expressed.

MR. JUSTICE SANNER and MR. JUSTICE HOLLOWAY concur.