## MIDWEST–BUTTE DEVELOPMENT CO. v. BUTTE WEST SIDE MINES CO. et al.

## BUTTE WEST SIDE MINES CO. et al. v. MIDWEST–BUTTE DEVELOPMENT CO.

Circuit Court of Appeals, Ninth Circuit.
May 20, 1929.

Rehearing Denied July 1, 1929.

No. 5599.

J. Bruce Kremer, L. P. Sanders, and Alf C. Kremer, all of Butte, Mont., for appellant.

Wm. Scallon, of Helena, Mont., for appellees.

Before RUDKIN and DIETRICH, Circuit Judges, and BEAN, District Judge.

DIETRICH, Circuit Judge. The "Minnie Jane" is approximately a full-sized lode mining claim situated in Silver Bow county, Mont. The end lines are substantially parallel, as are the side lines. For general purposes we shall refer to the side lines as being the north and south boundaries, though from the westerly end they run a little north of east. That part of the surface area lying north of a straight line drawn from a point 7 feet south of the northwest corner to a point 230 feet south of the northeast corner—both distances measured upon the end lines—is owned by plaintiff (appellant) and the area south of this line by defendants (appellees). Proceeding easterly the discovery vein, upon its apex, enters the claim at about the center of the west end, intersects the division line a little over 600 feet from the east end, is broken by an easterly dipping fault (called the main fault) which is nearly parallel, in its strike, with the end lines, and, with a throw of 30 feet to the north, continues until it departs from the north side line a few feet west of the northeast corner of the claim. In so far as it is identified the vein is shown to have a southerly dip of from 40 to 50 degrees both east and west of the fault. Asserting its continuity and identity across the part of the claim owned by it, hereinafter referred to as the deeded portion, plaintiff brought this suit to establish title, under the rule of extralateral rights, to a body of ore which defendants were extracting from beneath the surface of their portion of the claim, but which plaintiff contends is within the vein apexing in its territory both easterly and westerly from the fault. Touching the segment of about 76 feet, between the point of intersection with the common boundary line and the fault, it was successful in the court below, and to it was also awarded all that section of the vein, apexing in its territory, east of the fault. But holding that the evidence was insufficient to show continuity or identity the court declined to decree to it extralateral rights, under such apex, west of and beneath the fault. Upon the theory that the edge of the vein westerly from and contacting with the fault constitutes a subapex, the court confirmed in defendants' title to that portion of the vein throughout its entire depth west and beneath the fault and east of a vertical plane parallel with and 540 feet west of the east end line. Plaintiff appealed, and thereupon the defendants took a cross-appeal.

The principal question raised by the cross-appeal should first be disposed of, for a decision thereon favorable to cross-appellants would of necessity require the dismissal of the plaintiff's bill.

In brief, cross-appellants' contention is that whatever may be the position of the Minnie Jane vein, plaintiff did not by virtue

of the conveyances under which it claims title acquire anything south of the vertical plane of the common boundary line. An undivided one half interest it obtained by a deed from the patentee dated September 22, 1885, and the other half interest subsequently by prescription as established by a decree of a state court quieting its title. Of the estate thus acquired by prescription cross-appellees say that it is no more extensive and of no greater dignity than that conveyed by the deed, and, following their course, we shall discuss only the deed. They concede the validity of the instrument, but deny that it operates to confer upon the grantee extralateral rights. Furthermore, they concede that a patentee of a mining claim may by deed of either the whole surface area of his claim or any part of it transfer to the grantee just such an estate as would be conveyed by a patent for the same area, including the right to follow the vein upon its dip. The issue therefore is of the correct construction of the language of the deed. The instrument purports to convey "all the right, title and interest, estate, claim and demand" of the grantors "in and to that certain portion, claim and mining right, title and property on that certain ledge, vein, lode or deposit of quartz and other rock in place containing precious metals * * * situated in the Independence Mining District * * * and described as follows, to wit: (here follows an accurate description of the surface area by metes and bounds) together with all the dips, spurs and angles and also all the metals * * * and all bearing quartz, rock and earth therein and all the rights, privileges, franchises thereto incident, appendant and appurtenant or therewith usually enjoyed; and also all the estate, right, title, interest, possession, claim and demand whatsoever of the said parties of the first part in or to the premises and every part and parcel thereof."

The more reasonable rule, we think, is that in the absence of restrictive words a deed of the whole or a part of a mining claim, though silent as to extralateral rights, operates to convey the lateral extension of any vein apexing within the deeded area. After all the vein is the important thing in a mining claim. "The doctrine of extralateral rights had its origin in the theory that it is the vein which is actually located, and that the surface is a mere incident, necessary for the convenient development of the mine." Anaconda Copper M. Co. v. Pilot Butte M. Co., 52 Mont. 165, 178, 156 P. 409, 412. Or as was said by the court below, "So much of superior quality attaches to the apex of a vein that by reason of ownership of it accrues the title to any lateral extention and the right to follow it." And in Montana Ore P. Co. v. B. & M. C. C. & S. M. Co., 27 Mont. 288, 70 P. 1114, the Supreme Court of Montana aptly stated the principle thus: "A deed to a patented lode mining claim, or a definite portion thereof embracing an apex or apices, as such, in the absence of words of express reservation, will be presumed to convey whatever substantial property rights are attached to that species of property, and since extralateral rights are not a mere incident or appurtenance but a substantial part of such property itself, the grantee in such deed is vested with such rights upon vein or veins, extralaterally, as belong to the apex or apices embraced within the boundaries of the conveyed property." We find in the deed here no words of restriction or reservation, but upon the other hand a verbose attempt to express what, under this rule, general terms of grant would imply, and by the instrument as a whole we are left in no doubt that both parties thereto understood that the grant was of the whole of that part of the vein which apexes within the deeded area. As possibly giving a measure of support to their position, cross-appellants draw to our attention expressions in Eureka Co. v. Richmond Co., 4 Sawy. 302, 8 Fed. Cas. page 819, No. 4548 (and on appeal 103 U. S. 839, 26 L. Ed. 557); Montana Mining Co. v. St. Louis Mining Co. (C. C. A.) 102 F. 430; Id. (C. C. A.) 183 F. 51; Id., 204 U. S. 204, 27 S. Ct. 254, 51 L. Ed. 444; Stinchfield v. Gillis, 96 Cal. 33, 30 P. 839; Id., 107 Cal. 84, 40 P. 98; Riley v. North Star Min. Co., 152 Cal. 549, 93 P. 194; and Boston & Montana Consol. Copper & Silver Min. Co. v. Montana Ore-Purchasing Co. (C. C.) 89 F. 529; Id., 27 Mont. 288, 70 P. 1114; Id., 27 Mont. 536, 71 P. 1005. But inasmuch as they frankly concede that no one of these cases "can be said to be directly in point upon the question at issue," we do not prolong the discussion by pointing out the features clearly distinguishing them. Of Montana M. Co. v. St. Louis M. Co., 204 U. S. 204, 27 S. Ct. 254, 51 L. Ed. 444, upon which they apparently lay the greatest stress, perhaps we should say in passing, the court assumed the vein did not apex in the conveyed strip and hence gave controlling significance to the clause "together with all the mineral therein contained" as expressive of an intent to convey the segment within the area deeded to the grantee. Moreover the conclusion reached upon the peculiar facts and the language of the instrument is to be viewed in the light of the further statement that: "It is undoubtedly true that if the bond [deed] had

simply described the surface area or fixed a boundary line between the two claims, the subsurface and extralateral rights might have been determined by the mining law. It might have been implied that there was no intention to disturb the rights given by it."

We now turn to the questions presented on the primary appeal. From the opinion of the court below it appears that upon the hearing of plaintiff's application for injunction pendente lite plaintiff contended that in that district the throw of such a fault as we have hereinbefore described is always northerly, and that so thrown the vein in suit apexes within its territory. Conceding such to be the general rule in the district and that the other known faults upon this vein both within and without the Minnie Jane claim are in conformity therewith, defendants contended that this particular fault was an exception; that its throw was to the south with the result that the apex of the thrown segment courses easterly in defendants' territory. And this seems to have been regarded as the principal, if not the controlling, issue, though the defendants contended at that time, as at the final trial, that the vein was "dislocated, diffused, and crossed (the common boundary) at indeterminate depth." Holding that the throw of the vein and other questions were in reasonable doubt, the court granted an injunction in order that the ores might be preserved in place until final determination of title. Subsequently and before the final hearing, for the purpose professedly of meeting the issue of the throw of the vein, plaintiff sunk an incline shaft beneath and in contact with the main fault from a point about 25 feet north of the common boundary line and some feet west of the fault with a dip of about 40 degrees to the south and an equal rake to the east, to the 300 level where it connects with the 400 level by a raise from the latter and thus reaches to the principal known ore body in suit. Because of the disclosures thus made, or for other reasons, defendants at the final hearing abandoned their original contention respecting the throw of the fault and took the position that the evidence as a whole failed to show any apex east of the fault in the deeded portion or any relation between the ore bodies in suit and any vein apexing in that territory.

Inasmuch as in the main the findings of the court below appear to be warranted by the evidence, a brief statement of their substance will exhibit most of the salient facts. The court specifically found the location and course of the apex of the Minnie Jane vein and of the main fault, and also the throw at the fault, substantially as hereinbefore described. From the various underground workings west of and beneath the fault, including plaintiff's incline shaft, it found identity and continuity upon dip and easterly rake between the apex west of the fault and the principal ore body in suit, which is on the 400 level, and which, upon the assumption of like continuity east of the fault, would apparently lie within the vein upon its dip from the apex within the deeded portion. It will thus be seen that in a roundabout way identity and continuity were found between the apex in plaintiff's territory and the ore bodies in controversy. But with the exception of the westerly 60 feet of the 600 feet of apex east of the fault there are no workings below the surface and upon the 60 feet, to a depth of only approximately 30 feet. The diagonal or slope distance between the apex and the principal ore body in suit is approximately 550 feet. Adverting to various features of the evidence the court declined to indulge the presumption of the persistence of the vein through this distance downward upon the assumed dip from the disclosed apex to the disclosed ore body. In so declining it commented upon the failure of plaintiff to prosecute development to depth from any point upon this apex or to attempt correlation at depth between the sections east and west of the fault by drifts or crosscuts from the incline shaft through the fault and into the territory easterly therefrom. It found that the materials of the apex east and for some distance west of the fault were so broken, scattered and indefinite as not always to indicate fissure, ore or walls, and, further, that the variation in dip, "so far as with scant surface exposure only it can be relied upon indicates the likelihood that the unknown extent of movement of the country (perhaps along the strike fault) east of the main fault may have straightened up or steepened the dip of the vein." What the main fault, it was further said, "of unknown width, dip, strike and movement in depth, may have done to the vein, to say nothing of whatever other forces have affected the vein, can only be conjectured—by plaintiff is left to conjecture. The consequence is that in the incline shaft raking east along the strike of the vein plaintiff has demonstrated a subsurface apex to the vein for 200 feet and more, wholly within defendants' premises and without identity or continuity in respect to the apex in plaintiff's premises. If the fact is otherwise it is susceptible of proof with reasonable effort."

With these views for the most part we are in accord. We do not find adequate the rea-

sons assigned by plaintiff for its failure by appropriate underground development, either downward from the apex or laterally from its incline shaft, to correlate at depth the known vein west of the shaft with the projected vein easterly therefrom. But, granting the validity of these considerations, the extent to which the decree should go is a question attended with great difficulty. The slope or diagonal distance of 550 feet above given is an extreme; that is, it is the distance between the easterly end of the working upon the 400 level and a corresponding point on the apex in plaintiff's territory. Manifestly, as we proceed westerly from that point, such distance on dip from known apex to known vein, which the court found contacts with the hanging wall of the fault, gradually decreases, until at a point just east of the fault it is necessarily very short. By the decree extralateral rights west of the fault are granted to plaintiff only for the surface apex west thereof, but if we adopt the decree theory of a subsurface apex along the hanging wall of the fault, a short section of such apex would seem to be in plaintiff's territory. However that may be, we are of the opinion that upon the record as it stands plaintiff should be recognized as having extralateral rights below the fault for a distance upon the apex approximately 60 feet east of the fault. It is to be borne in mind that identity and continuity of the apex east and west of the fault are established. Some little depth, at least, of the vein thus apexing is to be presumed or inferred, and if at the apex the fault has not destroyed identity, we see no reason for assuming such destruction a short distance below the apex. But aside, from such inference, subsurface development for the distance specified renders correlation highly probable. In the working J on the 26 level just west of the fault, and the connecting workings L and K upon the same level just east of the fault, and the crosscut trench 8 feet deep about the easterly end of K, the disclosures of location, throw, dip, strike, and other characteristics are highly convincing of identity and continuity in a legal sense. Having in mind the established identity of apex, to deny correlation through the short distance to the established vein beneath the fault would seem to be arbitrary.

An added uncertainty is thus brought into the issue, for the record discloses no scientific means or geological data for a precise location of the easterly boundary line of plaintiff's extralateral estate either above or below the fault. A reasonable amount of additional development would doubtless clear up this and some other perplexing uncertainties. Both parties have suggested the desirability of modifying the decree by incorporating therein reservations touching features which future development may clear up. Upon the whole we think it would be in the interest of justice to remand the cause, with instructions that if either party desires to do further exploratory development and put in evidence the disclosures made thereby the decree be set aside and reasonable time be given for such additional work and the production of the evidence thereof. And such will be the order. In case neither party elects so to proceed, the decree will be modified so that the easterly vertical plane bounding plaintiff's extralateral estate will be drawn through a point in vein apex 60 feet east of the fault intersection at apex. Upon their cross-appeal defendants contend that in any view the westerly plane should be located not as now decreed at 616 but at 593. We agree that, there being no priority of discovery or location as between the parties, that plane should be drawn through the point of intersection of the center line of the apex with the common boundary line. Plaintiff contends that there, as well as elsewhere, the apex is broad, and defendants' position is that only the strike fault gouge is to be found in that section. While there is no express finding, the court may have adopted this latter view, and, if so, the location of the boundary would seem to be approximately correct. Directions will be given to make a finding upon the issue and to locate the boundary with reference to the intersection of the center line of the apex with the common boundary line.

Appellant will have judgment for one-half its costs on appeal.